WILLIAM F. EDINGTON et al., Respondents, *v.* THE ÆTNA LIFE INSURANCE COMPANY, Appellant.

By his applications for policies of life insurance D. warranted that he was then in good health and of sound body, that he usually enjoyed good health, and that he had not during seven years previous had any severe disease.  D. died within three years after the last application was made. Upon the trial of an action upon the policies issued upon such application it appeared that the death of the insured was caused by nervous apoplexy.  Defendant then offered to prove what causes produce that disease; also, that death thereby is the result of some disease or diseases of long standing; not from any sudden cause; this was objected to and rejected.  *Held*, error; that the evidence rejected was competent as bearing upon the warranties.

A physician testified as a witness for defendant that he became acquainted with D. in the winter of 1862; that he attended him professionally during the next spring and summer, and then ceased to attend or prescribe for him professionally, but his acquaintance continued until the death of D. The witness was then asked if D. was cured when he left his hands; if in his opinion D. was in good health, of sound body, and one who usually enjoyed good health in 1867, when the first application was made, and whether in his opinion, excluding any knowledge or information obtained while treating D., and judging from his appearance from that time until 1867, D. was in good health, etc.  These questions were objected to and excluded.  *Held*, error; that they were such as could properly be put to a physician under the provision of the statute (2 R. S., 406, § 73 *) prohibiting a physician from disclosing any information necessary to enable him to prescribe, acquired while attending upon a patient professionally.

To questions in the applications as to whether other applications had been made for insurance, and with what result, D. answered: "Yes, and always successful," and "Yes, accepted."  Defendant proved by the agent of another company that D. applied to him as such agent for a policy, and signed an application, which was presented to the medical examiner of the company, who had previously attended upon D. professionally, he declined to pass him, stating that an examination would be a farce as D. was not insurable; this the agent communicated to D.  Upon this evidence, which was unquestioned, defendant moved for a nonsuit, which was denied.  *Held* (EARL J.), error; that the delivery of the application to the agent was a delivery to the company; that the medical examination formed no part of it; that the action of the medical examiner was a rejection of the application; that the answers were untrue, and however innocently made avoided the policies.

(Argued April 9, 1879; decided September 16, 1879.)

* Substantially incorporated in Code of Civil Procedure, § 834.

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, in favor of plaintiffs, entered upon an order affirming an order denying a motion for a new trial. (Reported below, 13 Hun, 543.)

The nature of the action and the facts appear sufficiently in the opinion.

*John Gillette, Jr.*, for appellant. The breaches of warranties in the second application vitiated the second policy, notwithstanding any knowledge afforded the company on the subject of the diseases therein warranted against by the first application, and regardless of the question of materiality. (*Fitch* v. *American Pop. L. Ins. Co.*, 59 N. Y., 557; *Foot* v. *Ætna L. Ins. Co.*, 61 id., 571; *Cushman* v. *U. S. L. Ins. Co.*, 63 id., 404.) The court erred in excluding the evidence. of Proudfit in relation to the admissions and statements of the assured, made while he exhibited acts of debility and illness. (*Swift* v. *Mass. Mut. Ins. Co.*, 63 N. Y., 186; *Edington* v. *Mut. L. Ins. Co.*, 67 id., 185.) The question to Dr. Spaulding, as to whether the assured was a healthy man, was competent. (1 Phil. Ev. [4th ed.], 778–781, and cases cited; 1 Greenl. Ev., § 440.)

*F. O. Mason*, for respondents. The statements of the insured upon the application for the first policy did not preclude a recovery upon the second. (*Rawle* v. *Mut. L. Ins. Co.*, 27 N. Y., 282; *Swift* v. *Mass. Mut. L. Ins. Co.*, 63 id., 186.) Under the instructions given in the charge it was properly left to the jury to decide whether the answer to question thirteen in each application was true. (*Swift* v. *Mass. Mut. Ins. Co.*, 2 N. Y. S. C. R., 302; *Penniman* v. *Hudson*, 14 Wend., 579; *Boos* v. *World Mut. L. Ins. Co.*, 64 N. Y., 236; *Gibson* v. *Am. Mut. L. Ins. Co.*, 37 id., 580.)

EARL, J. This action is upon two policies of insurance issued by the defendant upon the life of Wilbur F. Diefendorf and by him assigned to the plaintiffs. One policy is

dated May 17, 1867, and the other May 13, 1868.  In each policy it is stated that the " proposal, answers and declaration " of Diefendorf of the same date are made part of the policy, as if therein recited, and that if they shall be found in any respect false or fraudulent, then the policy shall be null and void ; and in the application for each policy signed by Diefendorf is found the following :  " I do hereby declare and warrant that I am now in good health, of sound body and mind, and do usually enjoy good health ; and that the following answers and statements are correct and true, in which I have not concealed, withheld or misrepresented any material circumstance in relation to the past or present state of my health, habits of life or condition, which may render an assurance on my life more than usually hazardous, or with which the directors of said company ought to be made acquainted."  "And I do hereby agree that the answers given to the following questions and the accompanying statements are true, and this declaration shall be the basis and form part of the contract or policy between myself and the said company, and if the same be in any respect false or fraudulent, the said policy shall be void."   Forming a part of each application there is a series of questions and answers touching Diefendorf's health and insurable condition.

In each application there is a question whether the assured had ever had the disease of rheumatism or of the urinary organs.   In the first application the question is answered : " Had attack of rheumatism years ago ; "  and in the second it is answered : " No."   Each application contains the following question :  " Has the party had inflammatory rheumatism ?  If so, when and how often ? "   In the first application this is answered as follows :  " Once, years ago, bad."  In the second it is answered : " No."   Each application contains this question :  " Is the party subject to dyspepsia, dysentery or diarrhea ? "  and it is answered :  " No."   Each application contains the following :  " Has the party had during the last seven years any severe sickness or disease ?  If so, state the particulars and the name of the attending physician, or who

was consulted and prescribed ? " In the first application this is answered as follows : " Has had nervous difficulty and diarrhea. C. H. Carpenter, Geneva, N. Y." In the second it is answered : " No." In both applications C. H. Carpenter is referred to as the family physician. In each application is also the following question : " Has any application been made to this or any other company for assurance on the life of the party ? If so, with what result ? " In the first application this is answered as follows : " Yes, and always successful ; " and in the second it is answered : " Yes, accepted."

The action was defended upon the ground that some of the statements contained in the application were untrue and fraudulent. The defendant was, therefore, entitled to give any competent evidence it could showing or tending to show that any of such statements were either untrue or fraudulent : (*Foot* v. *Ætna Life Ins. Co.*, 61 N. Y., 571.)

During the progress of the trial several rulings upon questions of evidence were made which are now complained of as erroneous ; and these must first be noticed.

Dr. Picot was the physician who attended Diefendorf in his last illness in 1871, when he died ; and he certified and testified that his death was caused by nervous apoplexy. He was then asked this question : " State what causes will produce that ? " This was objected to on the part of the plaintiffs as immaterial, and the objection was sustained. Subsequently Dr. Swart, a physician of many years practice, was called by the defendant and testified that he was very familiar with the disease called nervous apoplexy, and that he knew what the authorities say about it. He was then asked this question : " State to the jury what it (the disease) is ? " The plaintiffs objected to this, and the objection was sustained. Defendant's counsel then offered to show by the witness " that death by nervous apoplexy is the result of some disease or diseases of long standing, and not from any sudden cause." This evidence was also objected to and excluded. The evidence excluded by these rulings should have

been admitted. It was not immaterial. Less than three years before his death the assured had warranted that he was then in good health and of sound body, and that he usually enjoyed good health, and that he had not during seven years previous thereto had any severe disease. As bearing upon these warranties, the defendant had the right to show the nature of the disease of which the assured died, and that it was of long standing.

Dr. Eastman was called as a witness for the defendant, and testified that his acquaintance with the assured commenced in the winter of 1862 and continued to the time of his death ; that he saw him almost daily during that winter ; and that he treated him professionally during the following spring and summer, prescribing for him frequently, and then ceased to attend him professionally or to be consulted by him. After that, to the time of his death, he continued to see him frequently as he met him in the street and other places. He testified that he did not appear like a well man ; that he was sick, weak, had the appearance of debility ; that his step was slow and languid, and his voice was low and feeble ; that he appeared like a feeble man, a man out of health ; that at times he appeared better, and at other times worse, and that on the whole his progress was downward, to the time of his death ; and that from time to time he discovered eruptions and pimples upon his face, which he described. He was asked this question : " Was he cured when he left your hands ? " This was objected to by the plaintiffs and excluded. The following questions were also put, objected to and excluded : " In the month of May, 1867, in your opinion was Wilbur F. Diefendorf a man in good health and of sound body, and one who usually enjoyed good health ? " " Excluding any knowledge or information that you obtained while treating Diefendorf, and judging from his appearance from that time until 1867, what is your opinion as to whether he was a man in good health, of sound body, and a man who usually enjoyed good health ? " It cannot be doubted that these

questions were very material, and that they were such as
could properly be put to a physician. But they were
excluded under the statute (2 R. S., 406, § 73) which pro-
vides, that "no person duly authorized to practice physic
or surgery, shall be allowed to disclose any information
which he may have acquired in attending any patient, in a
professional character, and which information was necessary
to enable him to prescribe for such patient as a physician,
or to do any act for him as a surgeon."

The rule excluding such evidence depends entirely upon
this statute. It did not exist at common law : (1 Phillips
on Ev., 164; *Duchess of Kingston's Case*, 20 How. St. Tr.,
613.) It should not, therefore, be made broader by con-
struction than the language of the statute plainly requires ;
and in applying the statute, the purpose of its enactment
should be kept in view ; and that was tersely expressed by
the revisers, in a note to the section, as follows : "The ground
on which communications to counsel are privileged, is the
supposed necessity of a full knowledge of the facts, to advise
correctly, and to prepare for the proper defense or prosecu-
tion of a suit. But surely the necessity of consulting a
medical adviser, when life itself may be in jeopardy, is still
stronger. And unless such consultations are privileged,
men will be incidentally punished by being obliged to suffer
the consequences of injuries without relief from the medical
art, and without conviction of any offence. Besides, in such
cases, during the struggle between legal duty on the one
hand, and professional honor on the other, the latter, aided
by a strong sense of the injustice and inhumanity of the rule,
will, in most cases, furnish a temptation to the perversion or
concealment of truth, too strong for human resistance."

Before information can be excluded under this statute, it
must appear that it was such as the physician acquired in
some way while professionally attending a patient; and it
must also be such as was necessary to enable him to prescribe
as a physician, or to do some act as a surgeon. It is not
sufficient to authorize the exclusion that the physician

acquired the information while attending his patient; but it must be the necessary information mentioned. If the physician has acquired any information which was not necessary to enable him to prescribe, or to act as a surgeon, such information he can be compelled to disclose, although he acquired it while attending the patient; and before the exclusion is authorized, the facts must in some way appear upon which such exclusion can be justified.

Now as to the first of the three questions above stated, it is necessarily inferable from the evidence that the witness attended the assured for some disease. But it does not appear that he discovered that disease or learned its nature while attending him professionally. He saw him frequently before he attended him, and saw him after he ceased to attend him; and the court could not say that he could not answer without disclosing the necessary information which he had obtained while in professional attendance upon him. So far as appears in the evidence, he was competent to tell whether he was cured of any disease with which he had been affected.

As to the second of the questions, the same observations are appropriate. How could the court know, without a particle of evidence, that it could not be answered without violating the statute? The witness, during several years when not in attendance upon the assured professionally, had seen him daily or weekly, and was well acquainted with his physical appearance; and the trial court could not say, and we cannot say that he could not answer the question from information thus acquired. But even if in answering the question he would have to use or disclose information he acquired while attending him, how can we upon the evidence say that such information was necessary to enable him to make his prescriptions?

There is still less reason for upholding the ruling as to the third question; because that in terms excluded all knowledge or information obtained while the witness was engaged in professionally treating the assured.

It is not incumbent on the party who seeks information from a physician who has been in attendance upon a patient, to show that the information was not acquired as specified in the statute ; but the party objecting must in some way make it appear, if it does not otherwise appear, that the information is within the statutory exclusion.

It will not do to extend the rule of exclusion so far as to embarrass the administration of justice. It is not even all information which comes within the letter of the statute which is to be excluded. The exclusion is aimed at confidential communications of a patient to his physician, and also such information as a physician may acquire of secret ailments by an examination of the person of his patient. The policy of the statute is to enable a patient, without danger of exposure, to disclose to his physician all information necessary for his treatment. Its purpose is to invite confidence and to prevent a breach thereof. Suppose a patient has a fever, or a fractured leg or skull, or is a raving maniac, and these ailments are obvious to all about him, may not the physician who is called to attend him testify to these matters ? In doing so, there would be no breach of confidence, and the policy of the statute would not be invaded. These and other cases which might be supposed, while perhaps within the letter of the statute, would not be within the reason thereof. *Cessante ratione legis, cessat et ipsa lex.* Therefore before information sought to be obtained from physicians as witnesses can be excluded, the court must know somewhat of the circumstances under which it was acquired, and must be able to see that it is within both the language and the policy of the law.

Another error of still more vital importance was committed. In 1863, one Windsor was the agent at Geneva of the Mutual Benefit Insurance Company of Newark, New Jersey. Diefendorf applied to him as such agent for a policy upon his life in such company. The agent told him that he did not think the company would take him. In a few days he applied to the agent again, when he was furnished by him

with a blank application, which he, Diefendorf, filled up and signed, and delivered to the agent. He and the agent then went to the house of Dr. Eastman, who was the medical examiner of the company and who had previously attended Diefendorf professionally. Not finding the doctor at home, Diefendorf left, and when the doctor returned the agent handed to him the application, and the doctor then said that he could not pass him, that the examination would be a farce and an unnecessary expense to the company, that he would have to expose Diefendorf if he examined him, and that he was not insurable. The agent afterward communicated this conversation to Diefendorf and the matter was then dropped, and he destroyed the application. There was nothing to cast any suspicion upon this evidence, and it was assumed by the judge upon the trial to be true. But he submitted the evidence to the jury for them to find whether upon these facts there was an application for insurance, within the meaning of the answers above given in the applications for the policies now in suit, and the charge was sustained by the General Term. Upon this evidence the defendant moved at the close of the trial that the plaintiffs be nonsuited, and its counsel requested the judge to charge the jury that if they found it true, the plaintiffs could not recover, and excepted to the charge upon the subject, and to the refusals to nonsuit and to charge as requested.

We think the nonsuit should have been granted. This evidence shows beyond question that application for insurance in the New Jersey company had been made, and that it had not been successful. Windsor was agent of that company to receive such applications. When the application was delivered to him it was delivered to the company, and Diefendorf had done all he could do or was required to do to place himself in the attitude of an applicant for insurance. In forwarding the application to the office of the company, Windsor would act not as his agent, but as agent for the company. The medical examination was no part of the application. That was something to be done after the appli-

cation was made. It was an act to be done not by Diefendorf, or at his expense, but by the medical examiner, as the agent of the company, and at its expense. The doctor knew him and was acquainted with his physical condition, and pronounced him unfit for insurance, without an examination. That left the case precisely as if an examination had been made and his application had then been rejected. It was just such information as this that the questions put to the assured in these applications were designed to elicit. The answers were clearly untrue, no matter how innocently they may have been made. There was nothing upon this branch of the case for submission to the jury, and the judge should have held that these answers avoided the policies.

The judgment must therefore be reversed and new trial granted, costs to abide event.

CHURCH, Ch. J., RAPALLO and MILLER, JJ., concur in result on ground that rulings on questions of evidence referred to in opinion were erroneous; FOLGER, J., took no part; DANFORTH, J., having been counsel took no part; ANDREWS, J., absent.

Judgment reversed.