# Court of Appeals.

*June,* 1887.

## PEOPLE *v.* SCHUYLER.

PRIVILEGED COMMUNICATIONS BETWEEN PHYSICIAN AND PATIENT.—SECTION 834, CODE CIV. PROC.—CONTRADICTION OF WITNESS.

Where a party seeks to exclude evidence under section 834 as being acquired by a physician attending a patient in a professional capacity, the burden is upon him to bring the case within the purview of the section. He must make it appear, if it does no otherwise appear, that the information he seeks to exclude was such as the witness acquired in attending the patient in a professional capacity not only, but he must also show that it was necessary to enable him to act in that capacity.

On a trial for murder, where the defense was insanity, the prosecu-

tion called a physician to testify as an expert as to the condition of the defendant's mind at the time of the commission of the crime, which was some eleven months before the trial. He testified that for six months preceding the trial he was the physician of the jail in which defendant was confined; that as such he had medical charge of all the prisoners, that during that time he examined the defendant at the request of both the prosecution and the defense, and "kept an eye on the case," and had defendant under observation, that he "saw to the defendant, as he did to the others, when he needed it." A hypothetical question was put to the witness, from which was excluded all knowledge which he personally had of the defendant, and which was based wholly upon facts which appeared before defendant came to the jail, and which concluded as follows: "Assuming those facts to be true, and without any reference to anything except those stated, was this man, if he did the act, sane or insane at the time he committed that act?" *Held*, that this question did not call for the disclosure of a privileged communication under section 834 of the Code of Civil Procedure, and was therefore allowable.

On cross-examination the witness stated that it was very questionable whether he could exclude in answering the hypothetical question the knowledge which he had obtained of the defendant while in jail, and that he was unwilling say, in giving his opinion as to the condition of the defendant's mind at the time of the commission of the crime, that he could eliminate from his mind such knowledge. He nowhere in his evidence intimated that he had any knowledge which he had obtained from the prisoner while attending him in a professional capacity, or that he had received any information whatever from him which was necessary to enable him to attend him as a physician, or that he had ever prescribed for him as a physician. *Held*, that such facts did not render the testimony of the witness inadmissible, nor was the court called upon thereby to grant a motion made by defendant to strike out the testimony of the witness.

Whether or not section 834 of the Code of Civil Procedure makes a physician incompetent to testify that his patient was free from disease of any kind, and whether or not a party can expose his ailments and make them the subject of inquiry, and then object to his physician's telling anything he may know about them,—*Query ?* The wife of defendant testified that the night before the crime, defendant came home sick, and she described his symptoms. She was asked on cross-examination

as to whether she had not stated, at a certain time and place, and in the presence of certain persons named, facts as to her husband's condition at variance with those to which she now testified, and upon her denial of such statements, witnesses were called to contradict her and show that she did make such statements. *Held*, that the evidence went no further than her examination fairly justified, and that it was a proper contradiction of her testimony.

Appeal by defendant John M. Schuyler from a judgment of the General Term of the Supreme Court in the Fourth Judicial Department entered upon an order made January 11, 1887, which affirmed the judgment of a Court of Oyer and Terminer of Otsego County, entered upon a verdict convicting the defendant of the crime of murder in the first degree, the charge being that he had on July 2, 1885, at the town of Morris, in Otsego County, with a deliberate and premeditated design to effect her death, killed his daughter Amy Schuyler by hurling her against a wooden block, thereby crushing in a portion of her skull and causing her death.

Upon the appeal to the General Term of the Supreme Court the following opinions were rendered.

*Clarence L. Barber*, for the people, respondent.

*Samuel S. Edick*, for defendant, appellant.

FOLLETT, J.—At the date of the homicide, the defendant, aged about twenty-seven years, occupied a dwelling-house at Morris with his wife, aged twenty-three years, and their two children, Amy, aged about three years, and Lizzie, aged about eighteen months. The defendant was a barber, and occupied a shop in the business part of the village, a little distance from his dwelling.

Between one and two o'clock in the afternoon of July 2, 1885, he went from his shop to his house for his dinner. While at dinner he and his wife engaged in a quarrel, during which he knocked her down with such force that

blood flowed from her head. Soon after, she escaped into the door-yard, leaving the defendant and the two children in the house. The eldest child began to cry, and the defendant stepped outside of the door, and called upon his wife to return and care for the children which she refused to do so long as he remained there. He replied that he would care for or kill the children (the witnesses do not precisely agree as to the words of this remark), entered the house, and immediately returned carrying the eldest child by its ankles, its clothes hanging down over its head, and swung the child over his head, striking its head against a section of a log used as a chopping-block, which stood near the door. This blow was twice repeated—he striking in all, three blows, which killed the child.

The defendant was indicted for murder in the first degree. Upon the trial the killing was conceded and there was no material conflict in respect to the circumstances of the killing.

Insanity was the defendant's sole defense.

From the date of the homicide, July 2, 1885, to the date of the trial, June 2, 1886, the defendant was confined in the jail of Otsego county. From July 2, 1885, to December 1, 1885, doctor Otis H. Babbitt was employed by the Board of Supervisors to treat such of the prisoners confined in jail as required medical aid, and he was called the jail physician. From December 1, 1885, to the date of the trial, Doctor Wilson T. Bassett was the jail physician. These physicians were sworn in behalf of the people, and in answer to a hypothetical question, testified, that in their opinions, the facts assumed indicated sanity. It was objected, in behalf of defendant, that these physicians were incompent, under section 834 of the Code of Civil Procedure, to answer this question, which was overruled.

These rulings are chiefly relied upon by defendant's counsel as grounds for a reversal of the judgment. In considering these rulings it is well to have the words of the section in mind.

"§ 834. A person, duly authorized to practice physic or surgery, shall not be allowed to disclose any information which he acquired in attending a patient, in a professional capacity, and which was necessary to enable him to act in that capacity."

Doctor Babbitt testified that he examined and prescribed for the defendant several times while jail physician, and regarded defendant as his patient. The hypothetical question did not call upon the witness "to disclose any information which he acquired in attending a patient in a professional capacity." The question called for an opinion, not for facts, and the answer disclosed no facts, and but an opinion. The question did not assume the existence of a fact which related to defendant's physical or mental condition, or conduct, while in jail; nor did it assume the existence of any fact which the witness could have learned while attending the defendant in a professional capacity, but the witness was called upon to give his opinion, based exclusively on facts which were assumed to have occurred before defendant was known to the witness. It seems a work of supererogation to attempt to demonstrate that the question is not prohibited by the section quoted, unless it must be held, as a matter of law, that this witness was incapable of excluding from his consideration facts learned, or opinions formed, while attending the defendant, and giving an opinion founded exclusively upon assumed facts which might be deemed to relate to another person as well as to the defendant. The witness testified that he could exclude from consideration all information acquired in attending the defendant, and form and give an opinion upon the facts assumed; and this court cannot declare, as a question of law, that he could not.

Persons who have opinions in respect to the guilt or innocence of a defendant, formed from reading or hearing accounts of the alleged crime, are competent to sit as jurors if it be established to the satisfaction of the court that they are capable of divesting themselves of the opinion so formed

and of rendering an impartial verdict on the evidence. In the case of a juryman, his opinions are not formed from personal observation, while in the case at hand, the witness may have derived an opinion or impression from personal observation; and in this respect, the questions are not analogous. But the defendant did not show, directly or inferentially that the witness had formed an opinion as to the sanity of the defendant from information acquired while attending him, and the question was not brought within the section. Edington *v.* Ætna Life Ins. Co., 77 *N. Y.* 564–571.

Doctor Wilson T. Bassett had been jail physician since December 1, 1885, and was when he testified. The following is the only evidence descriptive of the relations existing between the witness and defendant.

"Q. Are you the physician to the jail?

"A. I am; was appointed last November and commenced my duties some time forepart of December, I think, and have continued as such from that time down to the present; I see to the defendant as I do to the others whenever he needs it; I assume obligation of attending to those patients in the jail; the defendant is one of them; whenever he requires attendance; and that relation still exists."

This evidence was drawn out by defendant upon which to found the objection that the witness was incompetent to testify under the section above quoted.

There is no evidence in the case that defendant was ill while Doctor Bassett was jail physician; nor does the evidence disclose that the doctor examined, spoke with or prescribed for the defendant, unless such facts should be inferred from the evidence above quoted. It is a familiar rule, that when evidence is objected to upon the ground that the witness is incompetent to give the evidence, it must affirmatively appear that the witness is incompetent, and the burden of showing incompetency is upon the objector. Cary *v.* White, 59 *N. Y.* 339; Edington *v.* Ætna Life Ins. Co., 77 *Id.* 571; Steele *v.* Ward, 30 *Hun,* 560.

"Before information can be excluded under this statute, it must appear that it was such as the physician acquired in some way while professionally attending a patient; and it must also be such as was necessary to enable him to prescribe as a physician, or to do some act as a surgeon. It is not sufficient to authorize the exclusion that the physician acquired the information while attending his patient; but it must be the necessary information mentioned. If the physician has acquired any information which was not necessary to enable him to prescribe, or to act as a surgeon, such information he can be compelled to disclose, although he acquired it while attending the patient; and before the exclusion is authorized, the facts must in some way appear upon which such exclusion can be justified." (77 *N. Y.* 569.)

The fact that the witness was the jail physician, charged with the duty of observing and treating this, and all other prisoners, does not render his opinion incompetent unless it affirmatively appears that the relation of physician and patient actually existed, and that the information was acquired through, or for the purposes of that relation. The nominal relation of physician and patient, arising out of the legal duty of this physician, is not sufficient to exclude his opinions formed from his observations while such nominal relation only existed.

It will be observed that the witness did not give his opinion founded upon information acquired by him in any manner; but the opinion was founded solely upon a hypothetical question which assumed no facts which occurred subsequent to the day of the homicide.

After the witness had answered the hypothetical question, he said that he did not think it possible for him to answer it without being influenced by the opinion formed while acting as defendant's physician. Much stress is laid by the defendant upon this answer. If it had appeared that the actual relation of physician and patient had at some time existed, and the witness had then expressed a doubt

about his ability to answer the hypothetical question without being influenced by privileged information, a debatable question would be presented. In Edington v. Ætna Life Ins. Co. (supra), a physician who attended the insured during 1862 and then ceased to attend him professionally, but frequently saw him from that time until 1871, when he died, was asked:

(1.) "Was he cured when he left your hands?"

(2.) "In the month of May, 1867, in your opinion, was Wilbur F. Diefendorf (the insured), a man in good health and of sound body, and one who usually enjoyed good health?"

(3.) "Excluding any knowledge or information that you obtained while treating Diefendorf, and judging from his appearance from that time until 1867, what is your opinion as to whether he was a man in good health, of sound body, and a man who usually enjoyed good health?"

These questions were excluded at the trial, but were all held competent by the Court of Appeals. This case arose under the Revised Statutes, which is not different from the Code so far as the question under consideration is concerned. The third question above quoted calls for an opinion based upon information personally acquired by the witness; while the hypothetical question asked in this case removes the opinion called for much further from the statute.

No error was committed in permitting Doctors Babbitt and Bassett to answer the hypothetical question, or in refusing to strike out the answer of the latter.

Many exceptions were taken by the defendant during the trial, but they are unimportant, and cannot be made plainer than by reading the evidence to which they relate. They are not discussed in the appellant's brief and do not require discussion by this court. The charge was full and clear, and the exceptions taken to it are without legal force.

It is urged that the verdict is against the evidence. As before stated, the only defense was insanity. The defendant was but twenty-seven years of age, was born and has always resided in this State. It was not difficult to prove

with particularity his history from birth.    It was shown that when defendant was about nine years of age he was confined to the bed and house for a few days.    The witnesses testified to a fight between other boys and the defendant when he was about seven years old, in which he was pounded with stones.    She testified that afterwards he had boils, or bunches on his head.    There is no evidence that he was cut or bruised in this affray, or that he suffered from any injury then received.    It was testified that from time to time defendant suffered from severe attacks of headache. It was proved that in June before the homicide, defendant and one Fenton ran together upon a base ball ground, cutting Fenton's head and hurting both. but leaving no marks on defendant.    It is not claimed that the ordinary vocations of the defendant were interrupted by the accident. Aside from the sickness and the injuries referred to, there is no evidence that defendant was ever otherwise sick, or injured.    There is no evidence that the defendant ever committed an insane or irrational act, or that he ever uttered an insane or irrational expression, except on the occasion of a fire he unnecessarily commenced to remove the blinds from a building.    Upon a hypothetical question, which assumed as facts the matters above referred to and other unimportant circumstances not unusual in human life, and upon the atrocity of the act, four physicians testified that, in their opinions the defendant was insane when he killed the child ; but four other physicians testified that, in their opinions, he was not.    These witnesses examined the defendant during the trial, and none of them testified that they discovered evidences of then existing insanity.

It may be said that any person who, from anger, so far loses self-control as to commit an act like the one for which the defendant was tried, is insane, or not in his right mind ; but there is a broad distinction between such insanity and legal irresponsibility.

The judgment should be affirmed.

BOARDMAN, J., concurs.

HARDIN, P. J.—I concur. People *v.* Murphy, 4 *N. Y. Crim. Rep.* 95; 101 *N. Y.* 126, does not aid the appellant. In that case the witness was allowed to give an opinion, founded upon what he observed, as to the physical condition of the woman and upon her narration of the facts. Not so in this case.

*Adrian P. Barber, Samuel S. Edick* and *N. C. Moak*, of counsel for defendant, appellant.

I. The court erred in overruling the objection of defendant's counsel to the testimony of Dr. Bassett, and in denying his motion to strike out the answer of the witness to the hypothetical question.

(*a*) The relation of physician and patient clearly existed between the witness and defendant.

(*b*) Under the circumstances, to allow the physician to give an opinion, based, even in part, on what he had learned from communications to and from defendant, or from observations made while acting as a physician to defendant, was illegal and improper. *Code Civ. Proc.* §§ 834, 836; *Code Crim. Proc.* § 392; People *v.* Murphy, 101 *N. Y.* 126; 4 *N. Y. Crim. Rep.* 95; Renihan *v.* Dennin, 103 *N. Y.* 573; Westover *v.* Ætna Life Ins. Co., 99 *N. Y.* 56; Grattan *v.* Metropolitan Life Ins. Co., 92 *N. Y.* 274, 286, 287; 28 *Hun,* 430; Grattan *v.* Metropolitan Life Ins. Co., 80 *N. Y.* 281, 286; Edington *v.* Mut. Life Ins. Co., 67 *N. Y.* 185; Storrs *v.* Scougale, 48 *Mich.* 395, 396.

II. The court erred in permitting the witness, Dr. Babbitt, to testify.

Dr. Babbitt had been the defendant's physician from about July 3, to December 1, 1885. He was allowed to answer the hypothetical question of the prosecution, under defendant's objection and exception.

The witness was left to determine in his own mind how far he could base his answer upon the assumed facts, he having been, since the commission of the homicide, the defendant's physician, and of necessity must have been im-

pressed with his opinions as such physician, as well as upon the assumed facts contained in the question. How far was it possible for the witness to separate his opinions and base them upon different conditions? There is no way of determining. The hidden operation of the mind of the witness could not be disclosed. His opinion could not but have been regarded by the jury, as the opinion of another physician of defendant, rather than that of an expert answering merely a hypothetical question. Well might the jury reason, " who ought to know the condition of the defendant better than his physicians, and they testified that he was sane."

If a physician under the cover of an hypothetical question can be allowed to give his opinion as to the condition of his patient, then the protection under sections 834 and 836 of the Code of Civil Procedure is gone.

*Charles T. Brewer*, district attorney, for the people, respondents.

The following opinions were delivered in the Court of Appeals:

PER CURIAM.—The able and satisfactory opinion pronounced in the court below renders it unnecessary that much should be written now. A brief presentation of our views will be sufficient to justify the conclusion we have reached.

The killing by the defendant, of his child, was upon the trial undisputed; and his sole defense was insanity. The crime was committed on the second day of July, 1885, and the defendant was then twenty-seven years old. It does not appear that before that date he said or did anything indicating unsoundness of mind; nor does it appear that at any subsequent time he gave any sign whatever, by word or deed, of insanity. From the moment of the commission of the crime all his acts and conversations were perfectly sane and rational. He at once recognized the moral quality of

his act, and was perfectly aware that he had violated the
law, and was liable to be punished. Down to the trial of
this action it does not appear that he ever claimed that he
killed his child while unconscious or irrational, or laboring
under any delusion, but his avowal was that he had done it
in a passion.

Four physicians were called on the part of the defense,
who testified that they had examined the defendant, and in
answer to a hypothetical question, assuming such facts justi-
fied by the evidence as his counsel saw fit to insert therein,
stated that he was insane at the date of the crime. Four
physicians were called upon the part of the people, who in
answer to a hypothetical question put by the district at-
torney, which contained such facts justified by the evidence
as he saw fit to insert therein, testified that he was sane.

There was thus a question of fact as to the defendant's
sanity for the jury; and with their determination thereof,
based, as we believe, upon a preponderance of the evidence,
we have no occasion or power to interfere.

It appeared that the crime was committed when the de-
fendant was in a great passion. Upon the evidence there
was ground for claiming that there was the absence of that
deliberation and premeditation which are the necessary ele-
ments of the crime of murder in the first degree. But it
was not claimed upon the trial that there was not sufficient
evidence of the presence of these elements for the consid-
eration of the jury; and their determination, justified by
the evidence, also concludes us.

During the progress of the trial numerous exceptions to
the rulings of the court were taken on behalf of the defend-
ant. We have carefully examined and considered them all,
and we agree that all but two are unfounded; and as to the
two only is there difference of opinion among the members
of this court. To them, therefore, we will briefly direct
attention.

Among the expert witnesses called on behalf of the
people to give evidence as to the condition of the defend-

ant's mind at the time of the crime was Dr. Bassett. He testified that for six months preceding the trial he was the jail physician, employed by the board of supervisors of the county; that as such he had medical charge of all the prisoners in the jail; that during that time he examined the defendant at the request of both parties and "kept an eye on the case," and had him under his observation ; that he assumed the obligation of attending the prisoners in the jail, and "saw to the defendant as he did to the others, when he needed it." After these statements the court remarked to the district attorney: "You cannot give any testimony based upon any fact that he learned, either from the defendant, or in regard to the defendant, at any time when the relation of patient and physician existed."

A hypothetical question was then stated to the witness, from which was excluded all knowledge which he had of the defendant personally, and which was based entirely upon facts which occurred before the defendant came to the jail, concluding as follows: "Assuming those facts to be proved, and without any reference to anything except those stated, was this man, if he did the act, sane or insane at the time he committed that act ?"

This question was objected to on the part of the defendant, because the witness and he held the confidential relation of physician and patient; "that it is practically impossible to eliminate the position in which he stands and decide upon a question in this case, and the question put is in this case, as they claim upon the facts in this case, and therefore that the testimony of this witness is incompetent and improper."

The objection was overruled, and the witness answered : "Sane."

It is claimed that this question and answer were incompetent under section 834 of the Code, which provides as follows: "A person duly authorized to practice physic or surgery shall not be allowed to disclose any information which he acquired in attending a patient in a professional

capacity, and which was necessary to enable him to act in that capacity."

When a party seeks to exclude evidence under this section, the burden is upon him to bring the case within its purview. He must make it appear, if it does not otherwise appear, that the information which he seeks to exclude was such as the witness acquired in attending the patient in a professional capacity not only, but he must also show that it was such as was necessary to enable him to act in that capacity. Edington v. Ætna Life Ins. Co., 77 N. Y. 564.

Here there was no proof that the defendant was at any time sick during the six months in which the witness was the jail physician, or that the witness ever attended or prescribed for him as a physician, or that he derived any of the information upon which the question or answer thereto could be based while attending him as a physician.

It was assumed by the defendant's counsel, and by the court, that the mere fact that the witness was the jail physician created the relation of patient and physician between him and the defendant, and that the mere existence of that relation was sufficient to exclude evidence. But the assumption by the court was beneficial, rather than harmful, to the defendant. It restricted the examination of the witness and embarrassed him in giving his evidence. An erroneous ruling in defendant's favor could not render incompetent evidence which in its nature was competent; and the case is like that of a correct decision made by a judge under a misconception of the law. It does not appear, and cannot be inferred, that the defendant, in consequence of this erroneous assumption, omitted to prove anything which he otherwise could or would have proved.

The inquiry related to the condition of the defendant's mind at the time of the commission of the crime, about eleven months before the trial, and not to anything which occurred or appeared during the time he was confined in the jail; and the witness was not asked to testify as to the mental condition of the defendant while in the jail, or to disclose

any information he acquired while he was there. He did not in fact disclose any such information ; and it is utterly impossible for us to perceive how the evidence of the witness could have been excluded under that section. It is true he said it was very questionable whether he could exclude, in answering the hypothetical question, the knowledge which he had obtained of the defendant while in the jail, and that he was unwilling to say, in giving his opinion as to the condition of the defendant's mind at the time of the commission of the crime, that he could eliminate from his mind such knowledge. But he nowhere in his evidence intimated that he had any knowledge which he had obtained from the prisoner while attending him in a professional capacity, or that he had received any information whatever from him, which was necessary to enable him to attend him as a physician, or that he ever prescribed for him as a physician.

The hypothetical question was, therefore, in any view of the case, a competent question to put. It does not appear that in answering it the witness took into consideration any improper elements ; and if he was influenced by the knowledge he acquired of the defendant by seeing him in the jail, that circumstance did not render his evidence incompetent. He was not bound to eliminate from his mind that knowledge in answering the question ; and even if he could not, that did not render his answer incompetent. A proper question having been put and answered, the court was not, upon anything appearing in the record, bound to strike it out. The objection, therefore, to the evidence given by Dr. Bassett, and the rulings of the court in reference thereto, present no error requiring the reversal of this judgment.

The object of the section referred to was to prevent the disclosure by a physician of his patient's ailments and infirmities ; and it may be queried whether it makes him incompetent to testify that his patient was free from disease of any kind ; and was not Dr. Bassett, therefore, competent, under any view of the case, to testify that the defendant was not insane, but sane? And when the defendant called

experts who had examined him to testify as to his mental condition, and to show that he was insane, did he not waive his privilege under the section referred to and throw open the inquiry as to his mental condition? In other words: Can a party himself upon a trial expose his ailments and make them the subject of inquiry, and then object that his physician shall tell anything he knows about them? We do not deem it important to answer these questions at this time, and leave them to be solved when the exigencies of some future case may require it.

The defendant's wife was called as a witness in his behalf, and testified, among other things, that the night before the commission of the crime the defendant came home at 9 o'clock, sick at his stomach and with a severe headache; that he undressed and went to bed, and that she put a board at the foot of the bed, so that he could press his feet against it while his head would be against the head-board, and that he lay there for hours. On her cross examination her attention was called to a time when the district attorney and one Merrills were present with her at the court house, and she testified that she recollected having a conversation there. She was then asked questions and gave answers as follows:

Q. Did you say to Mr. Barber (the district attorney) in the presence of Mr. Merrills that you had never seen anything strange or unusual in John's conduct?

A. I don't remember of saying so.

Q. And that he was not affected by the ball play?

A. I never said so.

Q. And that he went to sleep as usual the night before the homicide, and ate as usual?

A. No sir; I did not say that as I remember, because it is not true. I don't remember of saying it.

Her attention was then called to another occasion the day after the commission of the crime, when the district attorney, Mr. Fairchild and Mr. Sweet were present, and she was asked questions and gave answers as follows:

Q. Did you say then to the district attorney, in the

presence of Mr. Fairchild and Mr. Sweet, that you had never seen anything strange or unusual in John's conduct?

A. I do not think I said so.

Q. That he went to bed as usual the night before?

A. I did not say so, for it was not true.

Q. You deny now that you said to Mr. Barber that he went to bed the night before, and slept as usual?

A. I don't remember talking to Mr. Barber the next day. I remember talking to him in his office in January.

Q. Did you say that to him there?

A. No, I don't believe I did.

Q. You didn't say anything of the kind?

A. I don't believe I said so at all.

Mr. Sweet was subsequently called, and testified that on the occasion referred to on the cross examination of Mrs. Schuyler, when he, Fairchild, and the district attorney were present, the day after the commission of the crime, she stated that she never saw anything peculiar in her husband before that time; and he was asked this: Q. "Did she say that the evening before, he came home, went to bed as usual, slept all night so far as she knew?" And he answered, "Yes, sir, she did." This question and answer were not objected to.

Subsequently Fairchild was called as a witness, and his attention being called to the interview with Mrs. Schuyler the day after the homicide, he was asked this question by the district attorney: " Did she there say to us that Mr. Schuyler went to bed about 9 P.M. the preceding evening, in his usual healthy condition, and slept all night, so far as she knew?" This was objected to by the defendant as improper and incompetent, and that there was no ground laid for the contradiction of Mrs. Schuyler, and any statements she then made could not be binding upon or used against the defendant. The objection was overruled, and the witness answered: " She did."

Merrills was called as a witnesses and, his attention being directed to the interview with Mrs. Schuyler when the dis-

trict attorney was present, was asked this question : " Did she say to me (the district attorney) in your presence, on that day, that she had never seen anything strange or unusual in John's conduct ?" This was objected to by the defendant's counsel as incompetent and improper. The objection was overruled, and the witness answered : " I think she said she had not, more than he had headaches once in a while. She spoke about that." He was then asked this question : " Did she say that he went to bed and slept as usual the night before the homicide ?" and he answered, " I think she did."

In the examination of these witnesses, Sweet, Fairchild and Merrills, no error was committed. The evidence was given merely for the purpose of contradicting and discrediting Mrs. Schuyler. She had testified on the direct examination that the defendant came home the night before the crime, sick ; that he undressed and went to bed and that she put a board at the foot of the bed so that he could press his feet against it with his head against the head board, and that he lay there for hours. The object of the district attorney was to show that she had made statements out of court at variance with his evidence ; and the object of her cross examination was to show that she had stated out of court that instead of going to bed in that unusual manner he went to bed as usual the night before and slept as usual. After she had substantially denied making such statements or any statements of that kind, these witnesses were called for the purpose of contradicting her ; and we think no error was committed in receiving their evidence.

That evidence went no further than her examination fairly justified ; and it was a proper contradiction of what she testified to.

Upon the whole case, we do not believe that any error was committed upon the trial prejudicial to the defendant, and the judgment should be affirmed.

All concur, except RAPALLO, and ANDREWS, JJ.

RAPALLO, J.—[Dissenting.]—The deceased was a daughter of the prisoner and his wife Minnie Schuyler, and was about three years of age. Evidence was given on the part of the prisoner that he had resided at Morris for four or five years and was a quiet, peaceable, and gentlemanly man. This was not controverted by the prosecution.

It appeared by the evidence of Minnie Schuyler, the mother of the deceased, that on the morning of the second of July, on leaving his home for his place of business, which was near by, he kissed her and his two children, as was his custom, and that he was always kind to the children, and particularly to Amy, for whom he showed partiality. When he went away his wife asked him to bring home some berries.

The evidence on this part of the prosecution showed that he did not return until about 2 o'clock in the afternoon, which was much later than his usual hour for dinner; that an altercation immediately ensued between him and his wife, which was followed by their throwing dishes at each other; that he then struck her, and she ran out into the yard through the woodshed which was in the rear of the house, he following her. Their next-door neighbor, Sweet, saw the affray through the window and cried out to him: "John, hold on." As he spoke the prisoner looked up at the witness, and Mrs. Scuyler ran out of the woodshed door, the prisoner right after her. As he came out of the door he said to witness: "This is a family affair and neighbors need not interfere." Witness then reproved him for striking his wife. The witness repeated the charge, and the prisoner again denied it.

Mrs. Schuyler then spoke and said: "John, you lie; you did strike me;" and she pointed to blood on her face; witness then turned away, and the next thing he saw was Mr. Schuyler going back into his house. He went a few steps and came out again. She was then going away from the woodshed door towards the road, and the prisoner asked her whether she was going to take care of those young ones,

and she said : "No, I am not." Other witnesses said her reply was, "No, I am not, while you are here." He then turned back and entered the woodshed door out of Sweet's sight and the next thing Sweet saw was the prisoner coming out of the woodshed door holding the child by both its ankles, head down, and he struck its head three times on a large wooden block which stood near the woodshed.

The mother, Sweet, and several neighbors who had been attracted by the fracas were then in sight, and their testimony substantially agrees with that of Sweet. There was no claim that the prisoner was intoxicated. As he dashed the child's head against the block he exclaimed, " See here !"

The space of time which elapsed between the prisoner entering the door of the woodshed and reappearing with the child was very brief. Sweet testified that it was not more than four or five seconds, and this was not controverted. It all happened while the wife was walking from the woodshed door towards the road, and she had gone but a short distance when the child was killed.

After having killed his child, he laid the body down by the block and walked to the front of the house, then turned back and took the body in his arms and carried it into the house, laid it on a lounge, and then went to the front of the house and said that he had killed the baby and expected to hang for it. He asked some one to go in and close its eyes and mouth, and to look after the younger baby, and proceeded toward the village. Meeting Mr. Gardner, a deputy sheriff, he surrendered himself, and said to him that he had killed the child, and that it would not have happened but for the neighbors. He was taken to a hotel where he remained in custody several hours, while the papers for his commitment were being prepared. During this time he conversed with several persons, and he was afterwards conveyed by wagon in charge of Gardner and Mr. Taylor, a former deputy sheriff, to the jail, twenty-two miles distant, occupying about four hours in the trip. His declarations to these witnesses, as well as to those with whom he con-

versed at the hotel, were put in evidence by the prosecution.

At the hotel he said to Hall: "I have killed my child and expect to hang for it." He began crying and lamenting, saying: "I have killed that dear child and the child was not to blame." "My poor little Amy, I have killed my child, my poor little innocent child;" that his temper got the best of him. To Dr. Hall he said: "They say I have killed my child. Is she dead?" He also said: "If it had not been for Sweet, it would not have happened."

Ralph Murdock, who appears to have been an intimate friend of the prisoner, came to see him at the hotel and the prisoner put his arms around his neck and said: "Ralph, don't be down on me for this; it was done in a passion; and what's done can't be undone;" and repeated "It was a sad, sad caper;" and later on he said that Sweet caused it. When told that he would not be tried before January, he expressed regret that he would have to wait so long.

In the wagon he sat with Taylor on the back seat and was handcuffed to him. He was sobbing and crying and repeatedly exclaiming: "Is it possible that I have killed that poor little child?" Taylor testifies that the prisoner slept on the way or seemed to be asleep, and would start up occasionally and speak of his child every time he aroused up and moan: "Oh, my poor little child."

Minnie Schuyler, the wife of the prisoner, was called for the defense, and related the origin of the quarrel with her husband on the occasion in question. She testified that when he came home to dinner she stood in the front door and he came along swinging his pail in such a manner that she thought he had no berries in it (in which she proved to have been mistaken) and she reproached him with being so late and keeping her waiting at a time of day when she had so much to do. An angry altercation then ensued. She says he looked so strange, so funny, that she accused him of having been drinking, which he denied. He sat down and she told him to help himself to the dinner. He looked very

staring, eyes glassy, very pale, and lips blue. She made some remark; he picked up a cup and saucer, and threw it; and she picked up a saucer, and threw it at him, and he grabbed her. She told him not to talk so loud, as the neighbors would hear, and he shut down the window. She ran into the back room and he struck her and she fell.

Then Sweet spoke to him, and she relates the rest according to the testimony of the witnesses for the prosecution. She says that she told him twice that he lied, and that she spoke unkindly to him, very unkindly. She was asked whether from what she saw of him then and heard him say she believed that he was rational or irrational then; but on objection by the prosecution the question was excluded.

The witnesses for the prosecution describe him as having looked very pale at the time of the commission of the crime.

The evidence on the part of the defense to sustain the plea of insanity was to the effect that when he was eleven years of age (he was twenty-seven at the time of the killing) he had a sunstroke, from the effects of which he was confined to his bed for several days; that he had been a weakly child from his birth, and was troubled generally with costiveness; that he had been beaten on the head with stones; that he had been brought home insensible from other injuries, that there were some depressions on his skull; that ever since the sunstroke he had suffered severe headaches, which caused him to manifest great pain, accompanied and followed by pallor; that a week or ten days before the homicide in playing ball he had violently butted his head against that of another person, and was thereby felled to the ground with much force; that from that time to the second of July he complained of severe headaches; and his wife testified that on the night before the homicide on retiring he complained of a severe headache, and when he retired she procured for him a board against which he pressed his feet while he pressed his head against the head-board of the bed, and lay thus for several hours. She describes these headaches as

very violent, and his actions as strange while he was suffering from them.

On the morning of the day of the homicide, which was a hot day, he worked for a considerable time hoeing in his garden in the sun, wearing a black skull cap. Afterwards during the morning he had a heated discussion in politics with a neighbor, in which he became much excited, and was in this condition when he came and was received by his wife in the manner which she described. There was a great deal of testimony on these and other points and on the part of the defense five physicians, Drs. Hall, Pilgrim, Crane, Hills and McClellan testified (four of them in answer to a hypothetical question detailing facts in evidence, and which was not objected to by the prosecution as assuming any fact not in evidence, and Dr. Hall testifying from what he saw on the day of the homicide) that in their opinion he was insane at the time of the commission of the act, two of them saying they had no doubt about it. Three of these physicians were acquainted with the prisoner and had seen him frequently at his residence; but they agreed that when they saw him after his arrest he was sane, their theory being that his brain was diseased in a manner liable to develop into insanity under peculiar excitement, and Dr. Hall expressing the opinion, on cross examination, that he was delirious at the time of the homicide.

This evidence was met by the prosecution by the testimony of four physicians who had never seen the prisoner until after he had been confined in the jail, and who (in answer to a hypothetical question framed by the prosecution, and which was objected to by the defense as assuming facts not in evidence and omitting facts in evidence) expressed the opinion that he was sane. To some of this evidence exceptions were taken by the defense, which are referred to hereafter; and exception was also taken to the admission of evidence as to declarations of the mother of the deceased, for the purpose of impeaching her credibility, which is also set forth in detail.

The atrocity of the act committed by the prisoner was such as necessarily to excite the indignation of the jury as well as of the court; but its unnatural character, in view of the previous character of the man, as a quiet and peaceable person, and of his affection for his child, renders it difficult, if not impossible, to conceive that he could have been, at the time, so far in possession of his faculties as to be capable of the deliberation which, by our statute, is made an essential element of the crime of murder in the first degree.

There was undoubtedly sufficient evidence of the intent to kill, and sufficient also to satisfy the former statutory requirement of premeditation; but in view of the conceded facts, and of the position taken by the prosecution, no case was made for the submission to the jury of the question of deliberation. The evidence as well as the claims of the prosecuting attorney, rebut the idea that the prisoner deliberately premeditated and intended the death of his child, and clearly characterize the act as one of momentary frenzy, resulting either from temporary insanity, or anger working on an enfeebled brain to such a degree as to render the patient incapable for the moment of deliberating or exercising his reasoning powers.

His conduct and exclamations after he had recovered from his paroxysm, and which were put in evidence by the prosecution, show that in the commission of the act he did violence to his own nature and affection. His lamentations over the death of his innocent child, the manner in which were expressed, so soon after the commission of the fearful deed, his anxiety that the punishment which he supposed that he merited should not be deferred, all show (and this is the evidence on the part of the prosecution) that he was not himself when he committed the act, and that he condemned himself as soon as he returned to consciousness. No intoxication is claimed by the prosecution, or could be claimed.

The claims of the prosecution on the trial, as shown, not only by the examination of the witnesses, but as summarized in the charge of the judge, were in accordance with what

the prisoner said to his intimate friend Ralph Murdock, when at the hotel after the arrest : "Ralph, don't be down on me for this. It was done in a passion; and what's done can't be undone."

The learned judge, in charging the jury, stated the claims made by the prosecution and the defense. The defense claimed that the pallor of the prisoner was one of the evidences of his insanity. The judge stated to the jury that it was claimed by the prosecution that the prisoner at the time was angry; "that he was pale from anger; that the expression of his eyes and his demeanor were from anger; that all the symptoms and appearances established by the evidence in the case were the symptoms of anger rather than those of insanity."

Assuming this to be all true, as claimed by the prosecution, taken in connection with the undisputed testimony of Sweet : that between the time of the last provocation, which appears to have incensed the prisoner, when he re-entered the woodshed, and the time when he reappeared holding the child by its ankles and dashed its head upon the block, not more than four or five seconds elapsed; that it all happened while his wife was walking away from the woodshed towards the road, and had proceeded but a very short distance; that the prisoner was pale from anger, and, considering these circumstances in connection with the other evidence on the part of the prosecution—is it possible to say that the evidence was such as to authorize a verdict of deliberation and premeditation, or even the submission of that question to the jury?

A man pale with rage seizes on the instant his favor child of tender years, and publicly, in the presence of his wife and neighbors, brutally dashes its head against a block, and immediately afterwards realizes what he has done, invokes death as the proper punishment for his crime, and pathetically laments the death of his child—and this a man of ordinarily quiet and peaceable disposition. If these facts do not indicate temporary insanity in a person whose physical con-

dition is such as to render him susceptible to such a haroxysm, they at least show such a momentary suspension of his moral faculties and reasoning powers as to render him, for the time, incapable of that deliberation which the law demands that the prosecution should establish.

But strange to say, that point was not taken on the part of the defense, and no exception raising it is contained in the case. This court is consequently powerless to correct any error which may have been committed in that regard, and although in my opinion a conviction of murder in the first degree was not justified under the conceded facts, and the verdict should have been in the second decree, irrespective of the defense of insanity, the only remedy for this error rests with the Executive.

With regard to the defense of insanity, the evidence was such as would have justified a finding either way; consequently the verdict of the jury is conclusive upon this court, unless some of the exceptions taken by the defense are sustained. In my judgment, under the circumstances of this case, these exceptions should be considered with careful attention—not because there is anything in the case which should incline us favorably towards the prisoner; but because, in my judgment at least, his conviction of murder in the first degree is not warranted by the present statute; and if any legal ground exists for having him retried and a proper verdict rendered, it should be made available.

One of the four physicians examined as experts on the part of the prosecution, Dr. Bassett, was the physician employed in the jail where the prisoner was confined after his arrest for the homicide, and it was his duty to attend and prescribe for the prisoners when ill. He had never known the prisoner before, and did not know his antecedents, upon which the physicians called by the defense had predicated their opinion that the prisoner's brain was diseased.

Dr. Bassett testified that he had been for forty-two years a physician and surgeon, and had examined the prisoner while in jail, commencing about the first of December (six

months after the homicide), and had kept his eye on the case ever since; that he was the physician of the jail, appointed in November, and had acted as such down to the time of the trial; that he saw to the prisoner whenever he needed it, as he did to the other prisoners; that he assumed the obligation of attending to those patients in the jail; that the prisoner was one of them, whenever he required attendance, and that that relation still existed.

Thereupon the prisoner's counsel objected to any testimony of the witness, and the court instructed him that he could not give any testimony based upon any fact that he learned, either from the prisoner or in regard to him at any time when the relation of patient and physician existed.

The district attorney then asked the following question:

Q. "Eliminating from your answer all consideration of any evidence that you obtained as to his condition from any talk with him, or from anything that you observed in him when you were attending him as jail physician, you may state, Is he sane or insane?"

This question being objected to, the court asked the witness: "Is it possible for you to eliminate the knowledge you have obtained there?"

The witness answered: "It is very questionable." The court then said: "I guess we will not take the evidence. I don't believe he can do it."

The district attorney then asked him whether he could, and the witness answered that he was not willing to say that he could separate the two; that it intermingled in such a way that he did not think he could separate them.

The district attorney then read to the witness a long hypothetical question of five printed pages, different from that which had been asked of the witnesses for the defense, and asked him to throw out of the case everything except the facts which he there assumed to be proved, and after reading the question asked the witness: "Assuming those facts to be proved, and without any reference to anything

except those stated, was this man, if he did the act, sane or insane at the time he committed that act?"

This question was objected to on the ground that it assumed facts not proved, specifying them; also, because the witness held the confidential relation of physician and patient; and it was practically impossible to eliminate the information obtained in that relation.

The court overruled the objection and allowed the question, and the witness answered, " Sane."

Being cross examined the witness stated that he thought it was a practical impossibility for him to eliminate from his own mind the convictions formed.as the physician of the prisoner, and thus answer the hypothetical question. Being reminded that he had answered it, he said that when it was ruled that he should answer he supposed that he must answer; that he withdrew his answer and did not wish it to be treated as an answer. The district attorney objected, and the court held that it could not strike out the answer; and the prisoner's counsel excepted.

I think the substance of the statement of the witness was that it was impossible for him to answer the hypothetical question without being influenced in his answer by the convictions he had formed while attending the prisoner as his physician; that consequently his testimony had been based in part upon what he had thus learned, and that when this was made to appear by the cross examination, the judge erred in holding that he could not strike out the answer which the witness had given, as he supposed under compulsion, and that the court not only had the power to strike it out, but ought to have done so. The witness was the most experienced physician examined in the case, and his testimony must have had great weight with the jury.

The ruling of the trial judge is sought to be sustained, on the ground that it was not distinctly proved that the witness had attended the prisoner as his physician. I do not think that this is a fair criticism. There was no suggestion, even upon the trial, of any such ground. If there

had been, then the proof on this point could have been made still more explicit than it was, for Dr. Babbitt, the predecessor of Dr. Bassett as jail physician and who acted as such during the first five months of the prisoner's confinement, stated that he prescribed for the prisoner several times, and like others, considered him his patient.    Dr. Bassett testified that he saw to the prisoner whenever he needed it, as he did to the other prisoners; that he assumed the obligation of attending those patients in the jail, and the prisoner was one of them whenever he required attendance, and that relation still existed.

The objection was placed upon the express ground that the confidential relation of patient and physician existed between the prisoner and Dr. Bassett; and this was in no way disputed, but on the contrary the district attorney, in his question, assumed that that relation existed, for he asked the witness to eliminate from his mind information obtained by Dr. Bassett while he was attending him as physician; and the court also assumed and held that the relation had been sufficiently proved, first by excluding the examination of Dr. Bassett, and next by asking him whether it was possible for him to eliminate the knowledge thus obtained, and at first excluding the witness on the ground that the court did not believe that he could eliminate the privileged matter.

After all this it would have been idle for the prisoner's counsel to go into details to show that Dr. Bassett had attended the prisoner as his physcian, a fact which appeared to be conceded by court and counsel.    It would be very unfair to deprive the prisoner of the benefit of his objection on the ground that he had not been sufficiently definite in his proof of the fact thus assumed and conceded.

I think there was also error in the admission of the question to George W. Fairchild, a newspaper editor, who had testified that he went with the disirict attorney, Mr. Barber, to Mr. Sweet's house to see the prisoner's wife, and there had a talk with her in presence of Mr. Sweet.    The district attorney then asked the witness the following question:

"Did she there say to us that Mr. Schuyler went to bed about 9 P.M. the preceding evening in his usual healthy condition and slept all night so far as she knew?"

The prisoner's counsel objected to this question as improper, incompetent, and that no ground had been laid for the contradiction of Mrs. Schuyler or any statements she made there, and that they could not be binding upon or used as evidence against the prisoner.

The objection was overruled, the defendant excepted, and the witness answered: "She did."

I think this exception was well taken. The only ground laid for the question as a contradiction was in the question to Mrs. Schuyler: "Did you say to Mr. Barber, in the presence of Mr. Fairchild and Mr. Sweet, that he went to bed as usual the night before," to which she made a negative answer. A contradiction of that answer would not have been very material, but the statement as testified to by the witness, and as recited in the question was a very material contradiction, and entirely different from that as to which she had been asked on her cross examination. She had testified to his severe headache that night, and her arranging a board against which to brace himself so as to press his head against the head-board of the bed, and other facts quite inconsistent with his then being in his usual health; and she had not been asked as to any statements in regard to the state of his health when he went to bed.

The prisoner's wife was a very important witness in his behalf, and many facts depended upon her testimony alone. Any impeachment of her credibility was, therefore, highly prejudicial to the defense.

For the errors pointed out I think there should be a new trial, upon which the degree of the crime may be considered.

ANDREWS, J., concurs.

Judgment affirmed.

NOTE.—See a note on privileged communications under section 834 of the Code of Civil Procedure, *infra,* p. 295