## THE PEOPLE *v.* IRA STOUT.

At common law, the information obtained by physicians in their professional
intercourse with patients was not privileged from disclosure.

The provisions of the Revised Statutes on that subject (2 *R. S.*, 406, § 73),
are intended to establish, between physician and patient, the same rule as
that existing between attorney and client.

The " information," of which the statute forbids the disclosure, is not confined
to communications made by the patient, but extends to all facts which neces-
sarily come to the knowledge of the physician in a professional case.

The statute is for the protection of the patient and not the physician, and being
of a remedial nature, it should be construed liberally and with reference to
the evil it was designed to remedy.

To bring a case within the protection of the statute it is not necessary that
the technical relation of physician and patient should exist; but the statute
is applicable where a physician has attended upon a person under circum-
stances calculated to induce the opinion that his visit was of a professional
nature, and the visit was so regarded and acted upon by the person so
attended.

Where a person had been arrested and confined in jail, on a charge of murder,
and was in a disabled and shattered bodily condition, and two physicians
were sent by the coroner to the jail to examine the injuries of such prisoner,
who informed him of the object of their visit, and whom he knew to be
physicians, and the prisoner consented and submitted to such examination,
and answered all the questions asked him, and requested one of the phy-
sicians, as he was leaving, to call again the next day, it was held, on the
trial of the prisoner for the murder charged, that the case was within the
statute, and that such physicians, who were called as witnesses, could not
be permitted to disclose any information they acquired on such visit to the
prisoner.

THE prisoner had been indicted for the murder of Charles
W. Littles.   At the trial, a question of evidence arose which
was considered and decided in the following opinion.   The
circumstances under which the question arose are fully
stated in the opinion of the majority of the court.

*C. Huson, Jr.* (District Attorney), for the people.

*J. N. Pomeroy,* for the prisoner.

*By the Court.*—In order to arrive at a correct determination of the question before the court, a brief review of the facts upon which it arises will be necessary.

Early on the morning of the twentieth of December last, the body of Charles W. Littles was found in the Genesee river, just below the high falls. The examination of the spot, which was soon thereafter made, induced the opinion that Mr. Littles had been killed during the preceding night, on the summit of the high bank above, and that his body had been thrown over the precipice and dragged to the river. There were some circumstances also indicating that the perpetrators of the crime had themselves been precipitated over the bank, either in the struggle or in their efforts to remove the dead body.

The prisoner was arrested during the forenoon of the same day, and taken to the police office, on suspicion of being one of the persons connected with the homicide. His arm was in a sling, and scratches and contusions were discernible on his face. He was committed to the county jail. The following morning his condition was such as to require medical aid, and accordingly Dr. Langworthy, the physician to the jail, was called in. The doctor visited him between ten and eleven o'clock. It does not appear that the prisoner knew Dr. Langworthy or his official character. The doctor thinks that he understood, however, that he was a physician. There was no prescription made at the time, but the doctor says he told him what he was going to prescribe, and thinks there was something said about his being his physician in future.

Shortly after this visit, and before noon, two gentlemen, whom the prisoner had seen the day before at the police office engaged in the post mortem examination of Littles' body, viz., Drs. Montgomery and Avery, appeared at the prisoner's cell and stated that they had been requested by the coroner to examine him and see what injuries there were about his person. Dr. Avery says he presumes they informed him that they were

physicians.   The prisoner was at the time lying on a cot in his cell, and either suffering considerable pain or much depressed.   They felt of his pulse, counted its pulsations by the watch, looked at his tongue, asked him questions, pressed on his chest and shoulder, and, in short, as they say, conducted themselves, as to their manner, precisely as if they had been examining one of their own patients with a view of ascertaining his injuries and making the necessary prescription or surgical operations.   The prisoner consented to the examination, granted every request, and answered all questions.   As the physicians were leaving, and before Dr. Montgomery was out of the cell, the prisoner asked him if he would call again, or to-morrow, or something to that effect.   There was no prescription made, and no conversation about any being made.   Dr. Montgomery, in response to a question, "whether, from their manner, the prisoner had reason to think they were physicians, and were examining him with a view to treatment, and whether, in his opinion, he did so regard them?" answers affirmatively, and gives as his reason the particulars of their manner, as above stated, and the "entire submission, and willingness, and readiness of the prisoner to do what was asked of him," together with the prisoner's closing inquiry, above given.

Upon this state of facts, Dr. Avery, the witness on the stand, is asked to describe the condition of the prisoner, as ascertained at that interview.

The counsel for the prisoner objects to the reception of any testimony under this question, on two grounds :

First.   That this examination was involuntary and compulsory on the part of the prisoner; and,

Second.   That the admission of the evidence would be a violation of the statutory prohibition against a disclosure by physicians of information derived in the course of professional treatment of patients.

It cannot be necessary to discuss the question suggested by the counsel for the prisoner under the first branch of the

objection, viz., that facts obtained compulsorily from a party charged with crime, cannot, any more than confessions thus obtained, be given in evidence, for we are of opinion that the mental state of the prisoner was one of assent to the examination. The very foundation of the counsel's argument therefore fails. The mere fact of being in custody cannot be urged against satisfactory evidence of positive assent.

The other branch of the objection deserves more consideration.

At common law the information derived by physicians in their professional relations with patients was not privileged from disclosure. The only privileged communications in this respect were those between attorney and client, and the general rule was adopted, that those communications passing between · them during the professional relation were protected from disclosure. The reason of this doctrine of the courts was the necessity on the part of the public of intrusting business to the legal profession, and the insecurity of so doing if the information thereby imparted were liable to divulgement.

The restriction of this doctrine to the legal profession was, at an early day, regretted. In *Wilson* v. *Rastall* (4 *Term R.*, 756 ), Mr. Justice Buller said " there were cases in which it was much to be lamented that the law of privilege was not extended to those in which medical persons were obliged to disclose the information which they acquired by attending in their professional character."

Upon the revision of the Statutes of this state in 1828, the revisors noticed this omission in the common law, and introduced a section amendatory of the defect, which is as follows :

" No person duly authorized to practice physic and surgery shall be allowed to disclose any information which he may have acquired in attending any patient in a professional

character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon." (2 *R. S.*, 327, § 93, 2*d ed.*)

The revisors' note to this section indicates clearly, in accordance with the manifest meaning of the provision, that the design was to create a privilege in the case of the medical profession analogous and commensurate with that which had always existed in the case of the legal profession.   The note is as follows: " The ground on which communications to. counsel are privileged is, the supposed necessity of a full knowledge of the facts to advise correctly, and to prepare for the proper defence or. prosecution of a suit; but surely the necessity of consulting a medical adviser, when life itself may be in jeopardy, is still stronger, and unless such consultations are privileged, men will be incidentally punished by being obliged to suffer the consequences of injuries without relief from the medical art, and without conviction of any offence.   Besides, in such cases, during the struggle between legal duty on the one hand and professional honor on the other, the latter, aided by a strong sense of the injustice and inhumanity of the rule, will in most cases furnish a temptation to the perversion or concealment of truth too strong for human resistance.   In every view that can be taken of the policy, justice or humanity of the rule as it exists, its relaxation seems highly expedient.   It is believed that the proposition in the section is so guarded that it cannot be abused by applying it to cases not intended to be privileged." ( 3 *R. S.*, 737, 2*d ed.*)

We are called upon for the first time, so far as we are aware, to give a construction to this statute upon the point involved in this case.   In the absence of authority, which we exceedingly regret, we must be guided by the obvious spirit of the statute, and by a reference to the analogous privilege as to counsel, of which privilege this statute, as it is apprehended it will be readily conceded, is merely declaratory as applied to physicians.

In the first place, it is plain to us that the "information" mentioned in the statute is not confined to communications made by the patient: it extends to all facts which necessarily come to the knowledge of the physician in a given professional case. Such a range must manifestly be given in the use of the term in order to effectuate the design of the statute, and is in accordance with the well settled rule in the case of an attorney. (11 *Paige*, 377.)

The next question is as to the persons between whom the relation must exist, It would seem to be absolutely necessary that the party on one side should be a duly qualified physician. That, under the statute, is in the nature of a condition precedent, so to speak. This qualification, also, has always been annexed to the privilege in the case of attorneys.

The remaining question, so far as this case is concerned, is, what must be the nature of the relation between the parties.

A literal construction of the statute would require the technical relation of physician and patient to exist. But is that indispensable? In the case of a visit from a physician, may there not be a state of circumstances which falls short of constituting this technical relation, but which presents a very proper case for the application of the statute?

This is, in our judgment, the real question before us, and it consequently deserves full consideration.

The thought naturally first suggested is, that the statute is for the protection of the patient and not for that of the physician. This very point has been ruled under the statute (14 *Wend.*, 637; *Johnson* v. *Johnson*, 2 *Cow. & Hill's Notes*, 1574), and it is in consonance with the well settled doctrine in the analogous case of attorney and client.

The statute is, moreover, of a remedial nature, and must be construed liberally. In the case of such a statute, it is peculiarly the duty of the court to look for its spirit, and be guided thereby in its application.

The spirit of this statute we apprehend to be that, whenever the confidential relation of physician and patient has once existed, and the patient has, in consequence thereof, yielded to examinations and made communications which he would not otherwise have made, the seal of secrecy shall be set on the transaction. It follows that it is the duty of the court to give full effect to this wise and humane provision. Such effect cannot, however, be given unless the party be protected in all cases of confidential disclosures whenever the patient had reason to suppose that the relation existed, and did, in fact and truth, so·suppose. The injury to him is as great, in the case of divulgement of information thus obtained, as it would be if the relation had technically existed; for it is plain that the opportunities for gaining the information would not have been voluntarily afforded had it not been for an entire confidence in the fact of such relation existing. We are of opinion, therefore, that in a case in which a physician has attended upon a person, under circumstances calculated to induce the opinion that his visit was of a professional nature, and the visit has been so regarded and acted upon by the person, that the relation of physician and patient contemplated by the statute may fairly be said to exist. The spirit of the statute is thereby respected, and no great violence done to its literal terms.

A reference to the corresponding privilege in the case of attorney and client, will, it is apprehended, confirm this view.

The rule in general statement is laid down quite as strictly as in the statute before us, that the professional relation must exist; yet it is well settled that no regular retainer as counsel is necessary, nor any particular form of application or engagement, nor the payment of fees, or the expectation of payment, or receipt of fees. (12 *Pick.*, 89; 3 *Sandf. Ch. R.*, 35.)

Again, the doctrine is laid down in general terms equally strictly, that the information, in order to be protected, must

have been necessarily obtained in the course of the profes-
sional relation, and that no collateral matters will be privi-
leged. But it has been held that the privilege extended to
any communication made by a client under a mistaken
belief of its being necessary to his case. (8 *Eng. L. and Eq
R.,* 554.)

And lastly, it has been held that the general rule that the
professional relation must exist is not inflexible, and that
there may be cases in which the. communications will be
privileged, although the relation did not, in point of fact,
exist at all. (*Smith* v. *Fell,* 2 *Curt.,* 667 ; 1 *Greenl. on Ev.,*
307, *note* 2; *Sargent* v. *Hampden,* 38 *Maine,* 58.) In the
former of these cases a professional person had been requested
to act as solicitor, and the communication was made under
the supposition that he had accepted. A brief extract from
the opinion of Howard, J., in the latter case, will not be
without value. After stating the common law rule and the
*rationale* of it, he proceeded :

"The reasons upon which this time honored rule of law
is founded may apply with equal force where one makes
application to counsel for professional services, although the
relation of client and attorney do not, in fact, subsist, as
where the latter may not conclude whether to withhold or
render his professional aid until the appliant has disclosed
the merits of his case. Then if he should decline to act
professionally in the matter, on account of prior engage-
ments and prior obligations to others, or from necessity or
choice, the disclosures and communications then made should
be privileged. As they were committed to him in his pro-
fessional character, the spirit of the rule would require that
they should not be divulged without the assent of the party
by whom they were made."

Support may also be derived from analogous cases. One
only will be suggested :

The Revised Statutes justify a homicide if committed by
a person in self-defence, when there shall be a reasonable

ground to apprehend a design to commit some great bodily injury on him, and there shall be imminent danger of such design being accomplished. Under a literal construction of this statute the imminent danger must be one of reality and fact, but a just regard for the spirit of the statute requires the extension of its provisions to other cases, and such liberality of construction has been shown by our courts. In *Shorter* v. *The People* (2 *Comst.*, 193), the Court of Appeals held that a case in which a person was attacked under such circumstances as to furnish reasonable ground for apprehending a design to take away his life, or to do him some great bodily injury, and there was reasonable ground for believing the danger imminent that such design would be accomplished, was a proper case for the application of the statute, although there was, in fact, neither design to do serious injury, nor danger that it would be done.

It remains to make an application of the fact before us to the proposed construction of the statute. The only point requiring consideration is whether the prisoner had reasonable grounds for the supposition that Drs. Montgomery and Avery came to him for the purpose of examination and treatment, and did so suppose.

In the first place, it is clear that he had reason to expect medical aid from the public authorities. He was in a disabled and shattered condition, evidently having either been engaged in a terrible struggle, or having fallen over the river bank, or both. He was a captive in the hands of the public authorities. It was their duty, under such circumstances, to furnish him all reasonable medical aid and attendance. This he had a right to expect, and probably did expect.

We are also of opinion that the prisoner had reasonable ground of apprehension that Drs. Avery and Montgomery called to render him aid. Their language to him which introduced this interview, though to our minds and at this distance from the occasion conveying a different meaning from that in which the prisoner manifestly received it, did

not necessarily exclude the idea of their visit being one of a professional nature. By a person reduced by pain and very much in need of treatment the language would not be closely scanned, and it might well be understood by him as a message from the coroner to examine into his injuries. Their manner to him was, moreover, purely professional, and as we now look at the description of it, aside from the other matters, we naturally adopt the conclusion that it was by professional men for professional purposes, rather than by government witnesses to obtain testimony for the prosecution. It may be said that Dr. Langworthy had been to the prisoner previous to this, and that, therefore, he could not have regarded the gentlemen in question as coming in a professional capacity. We think, however, that this circumstance rather adds strength to our view, than otherwise. The prisoner might well conclude from Dr. Langworthy's visit that the public authorities were moving in his behalf. Upon others calling, it would have been far from illogical for him to infer that Dr. Langworthy had reported him to be in a serious condition, and that therefore others had been called in to advise in connection with Dr. Langworthy.

And, lastly, we are of opinion that the prisoner regarded the visit in that light. His manner throughout, and particularly his closing question or remark about their calling again the next day, are, to our minds, almost conclusive evidence on this point.

It is no valid objection to an application of this statute, that the prisoner did not probably know of its existence, and had no opinion whether or not the particulars of that interview would be privileged from disclosure. It is a sufficient answer that the salutary rule of law stands upon the statute book, and is to be dispensed alike to those familiar with or ignorant of its existence and applicability.

If the prisoner's mind had been carefully disabused at the outset of any notion of the examination being solely for his benefit, and he had been carefully advised that its sole object

was to procure evidences of his guilt of the terrible crime of which he was suspected, there would be no ground or pretence for the position of his counsel. But so many things combining to satisfy us that he regarded the visit very differently, and had occasion for so doing, we feel bound, in a case like this, involving so deeply the dearest earthly rights of a man, to show all reasonable indulgence, both as to the law and fact.

We are of opinion that the objection to the testimony offered by the people should be sustained.

Goss, J. (Dissenting.) — The object of the statute was to make communications, made by a patient to his physician, confidential and privileged, and also to prohibit such physician from disclosing any fact or thing which he might learn in the treatment of the case. This was a wise and salutary provision, intended to protect the rights and feelings of patients, but, in order to be thus privileged, there must exist between the parties the relation of physician and patient. The patient must engage or employ his physician, and be liable (by an express or implied understanding) for the payment of his services. In this case, the physician called upon the prisoner, not as a physician at his request, but as the agent of public authorities of the county, to perform an official and not a professional duty, the same as a sheriff, constable or any other public officer might have been directed to perform. The prisoner was expressly informed by the physician that he called upon him by the order and under the direction of the coroner; he was not therefore misled as to the nature and character of the doctor's visit, and made no objection to such examination. Had the prisoner objected it could not have been properly made. As there was no deception, and the information as it appears fairly obtained, it can be regarded in the nature of a voluntary admission, and as such may be received in evidence. It seems clear to me that this case does not come within the prohibition of

the statute cited by the prisoner's counsel, and with all due respect to the opinion of the majority of the court, I dissent therefrom, and think that the objection to this evidence should be overruled.

In accordance with the opinion of the majority, the evidence offered was excluded.