THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
WILLIAM KEMMLER, Appellant.

*It seems,* expert evidence is entitled to consideration only when fairly
given by one properly qualified to give it by experiment, study and
scientific eminence and upon a hypothesis which is true in the relation
of its parts to the whole case which is the subject of the inquiry.

Upon the trial of an indictment for murder, evidence was admitted as to
quarrels between defendant and deceased and as to conversations between
them. *Held,* proper, as tending to show the existence of motive.

Physicians who had been sent to the jail by the district attorney to make
an examination of the prisoner were permitted to testify, as witnesses
for the prosecution, to his mental condition, under the objection that
either the relation of patient and physician existed, or else the prisoner
was compelled to furnish evidence against himself. *Held,* no error; no
evidence having been called for as to the prisoner's statements or as to
transactions in the jail.

*People* v. *Stout* (3 Park. C. R. 670), distinguished,

The court was requested, but refused, to charge that in fixing the grade
of crime, evidence of intoxication was important, and must be carefully
weighed; but did charge that all the evidence in the case was to be
weighed; that it was not the province of the court to state what evi-
dence is important or otherwise, that being for the jury to determine.
*Held,* no error; that while, *it seems* it would not be improper for the court
to characterize the evidence of a fact as important, and give its opinion
as to its weight if the question was fairly left to the jury, it was
under no obligation to do so.

The jury after its retirement, desired additional instruction as to the grade
of the crime and as to certain evidence, which was given without objec-
tion, the court reading certain portions of the evidence. The additional
instructions covered no more than did the main charge and simply pointed
out the proofs which bore upon the act of killing. *Held,* no error.

Punishment by death is not cruel within the meaning of the constitutional
prohibition (art. 1, § 5) against the infliction of cruel and unusual pun-
ishments; and while the infliction of the death penalty by a new agency is
unusual, the adoption of such an agency which is not a certainly prolonged
or torturous procedure, is not violative of the constitutional provision.

(Argued February 25, 1890; decided March 21, 1890.)

APPEAL from judgment of the Court of Oyer and Terminer
of the county of Erie, entered May 14, 1889, upon a verdict
convicting the defendant of the crime of murder in the first
degree.

The facts, so far as material, are set forth in the opinion.

*C. W. Sickmon* for appellant.  The court erred in permitting the witnesses Phelps and Slacer, physicians, called on behalf of the people to testify as to the mental condition of the defendant.  (*People* v. *Stout*, 3 Parker's Crim. Rep. 670; *Eddington* v. *M. L. I. Co.*, 67 N. Y. 197.)  The court erred in refusing to charge " that in fixing the grade of crime of which the defendant is guilty, the evidence of his intoxication must be carefully weighed."  (*People* v. *Batting*, 49 How. Pr. 392.) The instructions given by the court in pursuance of the request of the jury after its retirement, were erroneous and prejudicial to the defendant.  (*People* v. *Wileman*, 44 Hun, 187.)

*George T. Quinby* for respondent.  In no sense was the relation of physician and patient created.  (*People* v. *Schuyler*, 106 N. Y. 298, 304, 385.)

Gray, J.  The defendant was indicted for the killing of Matilda Ziegler and, after a trial at the Erie county Court of Oyer and Terminer, he was found guilty of murder in the first degree.  He was thereupon sentenced to suffer the punishment of death, to be inflicted by the application of electricity, as provided by the Code of Criminal Procedure.  The killing by the defendant was conclusively proved.  No attempt was even made to dispute that fact, as established by his admissions to several persons and by the circumstantial proof; but the defense relied upon was the mental irresponsibility of the prisoner, which was attempted to be shown to be the result of the effect of the habitual use of alcoholic stimulants, and of hereditary taints of drunkenness in the father and of consumption in the mother.  The deceased was the paramour of the defendant.  They had eloped from Philadelphia, where she had left her husband and he his wife.  They were residing together in Buffalo, and the deceased came to her death as the result of repeated blows upon her head and body from a hatchet in the defendant's hands.  No justification, or excuse, for the act of killing was attempted by him, and in the brief of his counsel none is offered.  We are led by the evidence to infer that jealousy of the deceased and domestic broils, stimulated,

I should judge, by his constant drunkenness, furnished the motive for this brutal crime. But whether we can attribute the commission of the act to some certain motive, or not, is wholly immaterial. The fact of the deliberate killing and the absence of any palliative proofs leave the defendant liable for the legal consequences of his acts; unless from the evidence it could be found that his mind was so enfeebled as to render him an irresponsible member of human society. A consideration of the case leaves the mind unembarassed in reaching the conclusion that the defendant was possessed of sufficient mental capacity to understand the nature of his act and to distinguish right from wrong.

The record before us discloses the commission of the crime early in the morning of March 29, 1888. The defendant, under the assumed name of John Hort, was a huckster of market produce, and had a wagon which he kept in a barn in the rear of his residence. Upon that morning he was about the barn, giving orders to his employes and attending to his horses and to various matters. He was quite sober, and presented no unusual appearance. The deceased came out from the house to the barn and asked for some eggs, which defendant got for her from his wagon. He went into the house after her and then attacked her by blows of a hatchet; the noise of which was heard by some of the witnesses, and by one witness in an adjoining room, in addition to the hacking noise, was heard the scream of the woman. The defendant was then seen coming out of the house, wiping blood from his hands. The woman was found upon her arms and knees on the floor, swaying to and fro, with blood upon and about her. She was removed to a hospital and the next day died from the wounds she had received upon her head, which counted over twenty in number. The defendant, to inquiries from persons who saw him immediately after the occurrence, said he had killed her and would "take the rope for it;" or, "I want to hang, I want the rope."

The evidence shows that the defendant and deceased had, at times, quarreled, because of his drinking, and she had threat-

ened to return to Philadelphia. A man, named DeBella, was employed by defendant in his business and was on intimate terms with him and the deceased, in the sense of being an inmate of the family and a companion in the defendant's carouses. It was testified that the defendant, subsequently to the murder, said that he was jealous of DeBella, and he may have questioned the relations between his wife and him.

Many witnesses were examined by his counsel with respect to the defendant's habits of life, and one, a medical expert, gave his testimony as to the effects of the continued use of alcohol upon the human system. As to the first class of witnesses, their evidence amounted to nothing more than to establish the fact that the defendant was a hard and habitual drinker and was frequently intoxicated. These witnesses were mostly the companions of his sprees, or the witnesses of his drunken debauches. The medical witness had examined the prisoner in the morning before he gave his evidence and his opinion was that he was a man of weak intellect, of imperfect brain development and more or less incapacitated to appreciate what transpires before him. These conditions, he thought, were indicated by the prisoner's physical appearance and the conversation he had with him. He also, upon a hypothetical question, gave evidence that such a mind would be unsound and incapable of discriminating as to the quality of his act. But the hypothetical question did not state the exact case of the prisoner, as developed by all of the evidence respecting his life and habits and by those circumstances which give truthful color and semblance to human life and conduct. It dealt with probabilities and not with realities. Expert evidence is only, it seems to me, entitled to much importance in arriving at a judgment, when fairly given by one properly accredited to give it, through his experience, study and scientific eminence, and upon a hypothesis which shall be true in the relation of its parts to the whole case which is the subject of inquiry. The frequent spectacle of scientific experts differing in their opinions upon a case, according to the side upon which retained, tends much to discredit such testimony, or to impair its force and useful-

ness, and inclines us to prefer the formation of an opinion upon the real facts, when the case is not one beyond the penetration and grasp of the ordinary mind. Here we have, as against this expert's evidence for the prisoner, that of two physicians, more or less qualified to pronounce upon the question of insanity from the physical appearance of the subject, to the effect that there was nothing in the prisoner's physical make-up, upon which an opinion of the prisoner's unsoundness of mind could be based. They expressed the opinion that he was able to distinguish between right and wrong and that his conduct, on the fatal morning, and subsequently, displayed a consciousness of the nature and quality of his act. But, beyond that kind of evidence, we have ample testimony of a more satisfactory kind, from those who knew him and who were constantly in the habit of seeing and of transacting business with him. From that evidence the defendant appears to have had a sufficient amount of intelligence and sagacity to conduct his business affairs with a measurable degree of success. All the facts respecting his habits of life, the conduct of his affairs, his appearance and actions before, at the time of and subsequent to the commission of the criminal act, were before the jury and we cannot say that there was any absolute, or positive, or preponderating evidence of unsoundness, or enfeeblement, of mind to warrant our interfering with the verdict.

We are asked to review some exceptions. It was argued that the court erred in permitting the testimony of witnesses as to the quarrels between the defendant and deceased; as to conversations between them, and as to statements of the defendant to others in relation to the desire of the deceased to return to Philadelphia. Such evidence, however, tends to show the existence of motives in the defendant and of possible influences acting upon his mind; and it is proper in aid of the jury's investigations of the occurrence and of its probable, or possible causes.

It is urged that the court erred in permitting the physicians, called as witnesses for the people, to testify as to the mental condition of the prisoner. The argument is that either the

relation of patient and physician existed, or else the prisoner was compelled to furnish evidence against himself. These physicians were sent to the jail by the district attorney to make an examination of the prisoner's mental and physical condition. On the stand they were not inquired of as to the conversations had with him, or as to the transactions in the jail. Their testimony was simply their opinion of his mental condition, as they saw him in his cell and in the court room, but they gave no evidence of his statements, or of his physical condition. Such evidence is quite unobjectionable. In the case of *People* v. *Stout* (3 Parker's Crim. Rep. 670), the visiting physicians attended and prescribed for the injured prisoner and they were allowed to describe his condition. That was held to be an error. But no such feature exists in this case.

An exception was taken to the refusal of the court to charge " that in fixing the grade of crime, of which the defendant is charged, the evidence of his intoxication becomes very important and must be carefully weighed." But the court, in response, did charge that " all the evidence in the case is to be carefully weighed, but it is not in the province of the court to tell you what is important or otherwise. You are to determine the importance of the testimony." We think the court committed no error in refusing to charge in the precise words of the request. Under our system of procedure it would not be improper for the trial judge to characterize the evidence of a fact, or of a condition of things, as important, upon the trial of the case, but he is under no obligation to make any comments of that nature. He may state the evidence and call attention to its features, and even express an opinion upon its weight, if the question is fairly left to the jury. It is their province to determine the conclusiveness of its bearing upon the guilt or innocence of the accused.

Finally, it is urged that when the jury returned to the court room and desired instructions upon certain points, in regard to the evidence of certain witnesses, and as to the definitions of the first and second degree of murder, the court erred in the giving of its further instructions, after the reading of the

evidence referred to in the foreman's request. But the court, in its instructions, covered no more ground than before in the main charge, and simply pointed out those proofs which bore upon the commission of the act of killing. Such instructions were asked for, in effect. There was no objection made at the time to a compliance with the request of the jury, and a consideration of their tenor does not reveal any bias, or hostile instruction, by which the prisoner might have been prejudiced. The details were ghastly enough to require no comment, and the facts were sufficiently undisputed to speak eloquently for themselves.

The trial was most fairly conducted by the prosecution and every effort was made to avoid improper evidence and to eliminate the presence of technical as well as substantial objections. The court was equally as solicitous, in the conduct of the trial, to prevent the introduction or retention of improper and illegal evidence, and in the charge fully, fairly and correctly stated the facts to the jury and the rules of law which were applicable to the issue they were to decide. They were instructed that they must acquit if the prisoner was irresponsible, and they were told that though voluntary intoxication did not make the act less criminal, yet, in determining the purpose, motive, or intent with which the act was committed, they might take into consideration the fact of intoxication.

A last point is made on this record, and that is, that the sentence imposed is illegal and unconstitutional, as being a cruel and unusual punishment. As that is the subject of review upon another record,[*] and will be discussed by another member of this court, I shall not stop to consider it here. I may add, however, that I think the point untenable. Punishment by death, in a general sense, is cruel; but, as it is authorized and justified by a law, adopted by the people as a means to the end of the better security of society, it is not cruel within the sense and meaning of the Constitution. The infliction of the death penalty through a new agency is, of course, unusual; but as death is intended as the immediate sequence

---

[*]See *People ex rel.* v. *Durston, ante,* p. 569.

Statement of case.

of the mechanical operation prescribed, it is not unusual in the sense that some certainly prolonged or torturous procedure would be understood to be. In my judgment, we should assume that the enactment of the legislature was based upon some investigation of facts, and, where the declared purpose and end of the law are the infliction of death upon the offender, we may not say, upon a ground work of possibilities and guess work, that it is, in any sense, an unconstitutional act, because a new mode is adopted to bring about the death.

There is no feature in this case which, in my opinion, mitigates the atrocity of the defendant's conduct, or any error of law which calls for another trial.

The judgment rendered upon the verdict of the jury should be affirmed.

All concur.

Judgment affirmed.