Feoessel, J.
At about 3:30 p.m. on March 14, 1955, a bright, sunny day, defendant was driving, alone in his car, in a northerly direction on Delaware Avenue in the city of Buffalo. The portion of Delaware Avenue here involved is 60 'feet wide. At a point south of an overhead viaduct of the Erie Railroad, defendant’s car swerved to the left, across the center line in the street, so that it was completely in the south lane, traveling 35 to 40 miles per hour.
It then veered sharply to the right, crossing Delaware Avenue and mounting the easterly curb at a point beneath the viaduct and continued thereafter at a speed estimated to have been about 50 or 60 miles per hour or more. During this latter swerve, a pedestrian testified that he saw defendant’s hand above his head; another witness said he saw defendant’s left arm bent over the wheel, and his right hand extended towards the right door.
A group of six schoolgirls were walking north on the easterly sidewalk of Delaware Avenue, two in front and four slightly in the rear, when defendant’s car struck them from behind. One of the girls escaped injury by jumping against the wall of the viaduct. The bodies of the children struck were propelled northward onto the street and the lawn in front of a coal company, located to the north o'f the Erie viaduct on Delaware Avenue. Three of the children, 6 to 12 years old, were found dead on arrival by the medical examiner, and a fourth child, 7 years old, died in a hospital two days later as a result of injuries sustained in the accident.
After striking the children, defendant’s car continued on the easterly sidewalk, and then swerved back onto Delaware Avenue once more. It continued in a northerly direction, passing under a second viaduct before it again veered to the right and remounted the easterly curb, striking and breaking a metal lamppost. With its horn blowing steadily — apparently because defendant was “ stooped over” the steering wheel — the car proceeded on the sidewalk until it finally crashed through a 7^-inch bride wall of a grocery store, injuring at least one customer and causing considerable property damage.
*136 When the car came to a halt in the store, with its horn still blowing, several fires had been ignited. Defendant was stooped over in the car and was ‘ ‘ bobbing a little ’ To one witness he appeared dazed, to another nnconscions, lying back with his hands off the wheel. Various people present shouted to defendant to turn off the ignition of his car, and ‘ ‘ within a matter of seconds the horn stopped blowing and the car did shut off ”.
Defendant was pulled out of the car by a number of bystanders and laid down on the sidewalk. To a policeman who came on the scene shortly he appeared 11 injured, dazed ’ ’; another witness said that “ he looked as though he was knocked out, and his arm seemed to be bleeding ”. An injured customer in the store, after receiving first aid, pressed defendant for an explanation of the accident and he told her: “I blacked out from the bridge ”.
When the police arrived, defendant attempted to rise, staggered and appeared dazed and unsteady. When informed that he was under arrest, and would have to accompany the police to the station house, he resisted and, when he tried to get away, was handcuffed. The foregoing evidence was adduced by the People, and is virtually undisputed — defendant did not take the stand nor did he produce any witnesses.
Prom the police station defendant was taken to the E. J. Meyer Memorial Hospital, a county institution, arriving at 5:30 p.m. The two policemen who brought defendant to the hospital instructed a police guard stationed there to guard defendant, and to allow no one to enter his room. A pink slip was brought to the hospital along with defendant, which read: “Buffalo Police Department, Inter-Departmental Correspondence. To Superintendent of Meyer Memorial Hospital, from Raymond J. Smith, Captain, Precinct 17. Subject, Be: One Emil A. Decina, 87 Sidney, CD-553284, date 3-14-55. Sir: We are forwarding one Emil A. Decina, age 33, of 87 Sidney Street, to your hospital for examination on the recommendation of District Attorney John Dwyer and Commissioner Joseph A. De Cillis. Mr. Decina was involved in a fatal accident at 2635 Delaware Avenue at 3:40 P.M. this date. There were three fatalities, and possibly four. A charge will be placed against Mr. Decina after the investigation has been completed.”
On the evening of that day, after an interne had visited and treated defendant and given orders for therapy, Dr. Wechter, a *137 resident physician in the hospital and a member of its staff, came to his room. The guard remained, according to his own testimony, in the doorway of the room — according to Dr. Wechter, outside, 6 or 7 feet away. He observed both Dr. Wechter and defendant ‘ ‘ on the bed ’ ’, and he stated that he heard the entire conversation between them, although he did not testify as to its content.
Before Dr. Wechter saw defendant, shortly after the latter’s admission on the floor, he had read the hospital admission record, and had either seen or had communicated to him the contents of the “ pink slip ”. While he talked with defendant, another physician came in and left. After giving some additional brief testimony, but before he was permitted to relate a conversation he had with defendant which was contained in the hospital notes, defense counsel was permitted with some restriction to cross-examine the doctor. In the course of that cross-examination, the doctor testified as follows:
That he saw defendant in his professional capacity as a doctor but that he did not see him for purposes of treatment. However, it was shown that at a former trial at which the jury had disagreed, he stated that the information he obtained was pursuant to his duties as a physician; that the purpose of his examination was to diagnose defendant’s condition; that he questioned the defendant for the purpose of treatment, among other things; that in the hospital they treat any patient that comes in.
He further testified at this trial that ordinarily the resident on the floor is in charge of the floor, and defendant was treated by more than one doctor; that he took the medical history. At the previous trial, when he was asked whether he represented the police and the district attorney, he replied: “I don’t know. I just seen him as a patient coming into the hospital ”. He now stated that he saw defendant as part of his routine duties at the hospital; that he would say that defendant “ was a patient ’ ’; that he was not retained as an expert by the district attorney or the Police Department, and was paid nothing to examine defendant; that his examination was solely in the course of his duties as a resident physician on the staff of the hospital, and that, whether or not he had a slip from the police, so long as that man was on his floor as a patient, he would have examined him.
He also stated he never told defendant that he had any pink *138 slip, or that he was examining him for the district attorney or the Police Department, or that defendant was under no duty to talk, or that anything he said might be used against him at a later trial. He further testified that he was a doctor at the hospital at which defendant was a patient; that he personally wrote items in the hospital record, after his conversations with defendant; that he saw defendant three times; that he was asked by the district attorney to submit a voucher for consideration by the comptroller’s office, but that was not done until after the first trial. He also stated at this trial that the discharge summary was made out by him, and that of the four sheets of progress notes, at least the first two sheets were in his handwriting.
The direct examination was then continued, the doctor being permitted to state the conversation with defendant over objection and exception. He asked defendant how he felt and what had happened. Defendant, who still felt a little dizzy or blurry, said that as he was driving he noticed a jerking of his right hand, which warned him that he might develop a convulsion, and that as he tried to steer the car over to the curb he felt himself becoming unconscious, and he thought he had a convulsion. He was aware that children were in front of his car, but did not know whether he had struck them.
Defendant then proceeded to relate to Dr. Weehter his past medical history, namely, that at the age of 7 he was struck by an auto and suffered a marked loss of hearing. In 1946 he was treated in this same hospital for an illness during which he had some convulsions. Several burr holes were made in his skull and a brain abscess was drained. Following this operation defendant had no convulsions from 1946 through 1950. In 1950 he had four convulsions, caused by scar tissue on the brain. From 1950 to 1954 he experienced about 10 or 20 seizures a year, in which his right hand would jump although he remained fully conscious. In 1954, he had 4 or 5 generalized seizures with loss o'f consciousness, the last being in September, 1954, a few months before the accident. Thereafter he had more hospitalization, a spinal tap, consultation with a neurologist, and took medication daily to help prevent seizures.
On the basis of this medical history, Dr. Weehter made a diagnosis of Jacksonian epilepsy, and was of the opinion that defendant had a seizure at the time of the accident. Other members of the hospital staff performed blood tests and took *139 an electroencephalogram during defendant’s three-day stay there. The testimony of Dr. Wechter is the only testimony before the trial court showing that defendant had epilepsy, suffered an attack at the time of the accident, and had knowledge of his susceptibility to such attacks.
Defendant was indicted and charged with violating section 1053-a of the Penal Law. Following his conviction, after a demurrer to the indictment was overruled, the Appellate Division, while holding that the demurrer was properly overruled, reversed on the law, the facts having been “ examined ” and found “ sufficient ”. It granted a new trial upon the ground that the “ transactions between the defendant and Dr. Wechter were between physician and patient for the purpose of treatment and that treatment was accomplished ’ ’, and that evidence thereof should not have been admitted. From its determination both parties have appealed.
We turn first to the subject of defendant’s cross appeal, namely, that his demurrer should have been sustained, since the indictment here does not charge a crime. The indictment states essentially that defendant, knowing “ that he 'was subject to epileptic attacks or other disorder rendering him likely to lose consciousness for a considerable period of time ”, was culpably negligent ‘ ‘ in that he consciously undertook to and did operate his Buick sedan on a public highway ” (emphasis supplied) and “ while so doing” suffered such an attack which caused said automobile “ to travel at a fast and reckless rate of speed, jumping the curb and driving over the sidewalk” causing the death of 4 persons. In our opinion, this clearly states a violation of section 1053-a of the Penal Law. The statute does not require that a defendant must deliberately intend to kill a human being, for that would be murder. Nor does the statute require that he knowingly and consciously follow the precise path that leads to death and destruction. It is sufficient, we have said, when his conduct manifests a “ disregard o'f the consequences which may ensue from the act, and indifference to the rights of others. No clearer definition, applicable to the hundreds of varying circumstances that may arise, can be given. Under a given state of facts, whether negligence is culpable is a question of judgment. ’ ’ (People v. Angelo, 246 N. Y. 451, 457.)
Assuming the truth of the indictment, as we must on a demurrer, this defendant knew he was subject to epileptic *140 attacks and seizures that might strike at any time. He also knew that a moving motor vehicle uncontrolled on a public highway is a highly dangerous instrumentality capable of unrestrained destruction. With this knowledge, and without anyone accompanying him, he deliberately took a chance by making’ a conscious choice of a course of action, in disregard of the consequences which he knew might follow from his conscious act, and which in this case did ensue. How can we say as a matter of law that this did not amount to culpable negligence within the meaning of section 1053-a?
To hold otherwise would he to say that a man may freely indulge himself in liquor in the same hope that it will not affect his driving, and if it later develops that ensuing intoxication causes dangerous and reckless driving resulting in death, his unconsciousness or involuntariness at that time would relieve him 'from prosecution under the statute. His awareness of a condition which he knows may produce such consequences as here, and his disregard of the consequences, renders him liable for culpable negligence, as the courts below have properly held (People v. Eckert, 2 N Y 2d 126, decided herewith; People v. Kreis, 302 N. Y. 894; Matter of Enos v. Macduff, 282 App. Div. 116; State v. Gooze, 14 N. J. Super. 277). To have a sudden sleeping spell, an unexpected heart or other disabling attack, without any prior knowledge or warning thereof, is an altogether different situation (see Matter of Jenson v. Fletcher, 277 App. Div. 454, affd. 303 N. Y. 639), and there is simply no basis for comparing such cases with the flagrant disregard manifested here.
It is suggested in the dissenting opinion that a new approach to licensing would prevent such disastrous consequences upon our public highways. But would it ■— and how and when? The mere possession of a driver’s license is no defense to a prosecution under section 1053-a; nor does it assure continued ability to drive during the period of the license. It may he noted in passing, and not without some significance, that defendant strenuously and successfully objected to the district attorney’s offer of his applications for such license in evidence, upon the ground that whether or not he was licensed has nothing to do with the case. Under the view taken by the dissenters, this defendant would be immune from prosecution under this statute even if he were unlicensed. Section 1053-a places a personal *141 responsibility on each driver of a vehicle — whether licensed or not — and not upon a licensing agency.
Accordingly, the Appellate Division properly sustained the lower court’s order overruling the demurrer, as well as its denial of the motion in arrest of judgment on the same ground.
The appeal by the People (hereinafter called appellant) challenges the determination of the Appellate Division that the testimony of Dr. Wechter was improperly admitted in contravention of section 352 of the Civil Practice Act, which states that a physician ‘ ‘ shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity ”.
Two questions are raised by this appeal. The first is whether a physician-patient relationship existed between Dr. Wechter and defendant, and, if so, whether the communications made by defendant to him were necessary for the doctor to act in his professional capacity. The second is whether the presence of the police guard in the doorway of the room destroys any privilege arising under section 352 and permits the doctor to testify. It is not contested that defendant, as the party asserting the privilege, bears the burden of showing its application in the present case (Bloodgood v. Lynch, 293 N. Y. 308, 314; People v. Austin, 199 N. Y. 446, 452; People v. Koerner, 154 N. Y. 355, 366; People v. Schuyler, 106 N. Y. 298, 304). He claims to have sustained the burden on the basis of appellant’s own evidence previously outlined.
Appellant contends that no professional relationship arose because the doctor was sent by the district attorney to examine, not treat, the defendant, and in fact he did not treat him. The cases upon which appellant relies are readily distinguishable from the one now before us. In People v. Schuyler (supra), for example, a jail physician was allowed to testify, over an objection based on the predecessor statute to section 352 of the Civil Practice Act, to his observations of the prisoner’s mental condition. There was no evidence that the prisoner was ill, or that he was attended by, treated, or required any treatment by said jail physician while in custody.
The criterion to be applied in determining whether or not a professional relationship exists was stated in People v. Austin (199 N. Y. 446, supra). The testimony of a physician describ *142 ing an examination of defendant in jail relating to his sanity was found admissible because there were no circumstances from which it might be inferred that the defendant ‘‘ was led to accept him [the examining doctor] as a physician and consequently to disclose to him information that perhaps would not otherwise have been given” (p. 452). This rule the court derived from People v. Stout (3 Parker Cr. Rep. 670, 676).
In People v. Koerner (154 N. Y. 355, 365-366, supra), as in People v. Furlong (187 N. Y. 198, 208-209), testimony of physicians was admitted, but in each case the defendant was explicitly informed that the physician was not acting in his capacity as a doctor or that information obtained might be used against him in subsequent legal proceedings (see, also, People v. Leyra, 302 N. Y. 353, 363, which had an altogether different fact pattern, however).
People v. Sliney (137 N. Y. 570, 580) and People v. Hoch (150 N. Y. 291, 302-303) are consistent with the rule of the Austin and Stout cases (supra). They are additional instances where the testimony of physicians who held examinations in jails was admitted, since no evidence was adduced from which it might be found that the defendants could reasonably have regarded the physician as acting in a professional capacity towards them.
Appellant further contends that there can be no finding of physician-patient relation in this case because there is no evidence that Dr. Wechter actually treated defendant. The cases relied on by appellant are inapposite. They properly hold that where a physician does treat a person, regardless of whether it is at his request, or with his consent, the relation arises, but they do not hold the converse (Meyer v. Knights of Pythias, 178 N. Y. 63, affd. 198 U. S. 508; People v. Murphy, 101 N. Y. 126). In determining whether or not information necessary for treatment is privileged, the question as to whether or not actual treatment is undertaken is not decisive (Grattan v. Metropolitan Life Ins. Co., 24 Hun 43, 46).
In any event, although Dr. Wechter testified that he personally did not treat defendant, he admitted that other doctors and internes in the hospital did “ treat ” him for Jacksonian epilepsy. He himself made that diagnosis. To say that in a hospital, where there is division of duties among the staff, the relation of physician and patient does not arise with regard to those members of the staff who do not actually treat the patient *143 is unsound. It would place upon section 352 strictures that are opposed to our oft-expressed view that the statute is to be liberally construed (Buffalo Loan, Trust & Safe Deposit Co. v. Knights Templar & Masonic Mut. Aid Assn., 126 N. Y. 450, 455; Matter of City Council of City of N. Y. v. Goldwater, 284 N. Y. 296, 300; Edington v. Mutual Life Ins. Co., 67 N. Y. 185, 194).
It is apparent that the information here given by the defendant was necessary for his treatment. Those cases allowing disclosure by physicians of information related to them by their patients deal with such nonprofessional matters as details of an accident entirely unrelated to treatment (Griffiths v. Metropolitan St. Ry. Co., 171 N. Y. 106; Green v. Metropolitan St. Ry. Co., 171 N. Y. 201; Gray v. City of New York, 137 App. Div. 316, 321; Travis v. Haan, 119 App. Div. 138; Benjamin v. Village of Tupper Lake, 110 App. Div. 426; De Jong v. Erie R. R. Co., 43 App. Div. 427), or facts such as a layman might observe (Klein v. Prudential Ins. Co., 221 N. Y. 449; Sparer v. Travelers Ins. Co., 185 App. Div. 861). Evidence of a prior medical history of a disease for which defendant was treated cannot be said to be information unnecessary for treatment. The communication is therefore within the conditions set forth in section 352.
The second question will now be dealt with. The problem here is what effect, if any, the presence of the police guard, pursuant to the orders of the district attorney, in or about the doorway of the hospital room, where he could overhear the conversation between Dr. Wechter and defendant, has upon the privilege under section 352. That section does not in so many words require that a communication be confidential or confidentially given in order to be privileged. So we turn to the cases. In Matter of Coddington (307 N. Y. 181, 187-191) (then) Conway, J., pointed out that Judge Earl attempted, in Edington v. Ætna Life Ins. Co. (77 N. Y. 564) to confine the statute to information of a confidential nature, but the court did not agree with him on that point. As a result of the cases that followed — Grattan v. Metropolitan Life Ins. Co. (80 N. Y. 281) and Renihan v. Dennin (103 N. Y. 573) — in the latter of which Judge Earl suggested legislation, section 836 of the Code of Civil Procedure (now Civ. Prac. Act, § 354) was amended to allow physicians in effect to testify as to nonconfidential communications of deceased patients where the privilege has been waived by persons *144 authorized by the section to do so. The language of those cases was exceedingly broad, and it was pointed out that, under the literal phraseology of code section 834, the physician was absolutely prohibited from testifying so long as the conditions of the statute were met.
Faced with the problem of the effect on the privilege of the presence of third persons, our Appellate Divisions turned to these decisions and found them authority for holding the testimony of the physicians privileged. In Denaro v. Prudential Ins. Co. (154 App. Div. 840, 843 [2d dept.]), a patient was examined by a doctor “in the presence of [his] * * * father or others near ”, and it was held that the physician could not testify; the persons present may testify, but the physician is bound by the rule. Hobbs v. Hullman (183 App. Div. 743 [3d dept.]) decided that where a conversation was had between a physician and a patient in the presence of a nurse, who was neither a professional nor a registered nurse, the doctor’s testimony was inadmissible. A third case, Sparer v. Travelers Ins. Co. (185 App. Div. 861, 864 [1st dept.], supra), reached the same conclusion; it did not allow the testimony of a physician as to the details of an operation he performed to be received in evidence, although a medical student was present during its performance. And now the 'fourth department in the case at bar has impliedly held likewise in the ease of a police guard. The present case falls clearly within the scope of these decisions. If anything, it presents an even stronger situation, for the guard’s presence was ordered by command of the public authorities.
An opposite result is not indicated by those cases dealing with the effect of the presence of a third person upon the attorney-client privilege under section 353 of the Civil Practice Act (Baumann v. Steingester, 213 N. Y. 328; People v. Buchanan, 145 N. Y. 1, 26). The Denaro case (154 App. Div. 840, supra) expressly held that the situations were not analogous. It may be noted that the applicable statutes are not identical. Under section 353, relating to attorneys, the privilege extends only to ‘ ‘ a communication, made by his client to him ’ ’. Under section 352 relating to physicians, however, the privilege extends to ‘ ‘ any information which he acquired in attending a patient ’ ’; since such information may be acquired from third persons — and third persons who have some definite relationship to the *145 patient are often present — the situation is not analogous to an attorney-client relationship.
Whether or not this distinction accounts for the fact that in attorney-client cases it has generally been held that the presence of a third person destroys the privilege, the cases suggest that even here there are exceptions (Baumann v. Steingester, supra, p. 332; People v. Buchanan, supra, p. 26). So if the communication was intended to be confidential, the fact that it may have been overheard by a third person does not necessarily destroy the privilege (see People v. Cooper, 307 N. Y. 253, 259, n. 3; Erlich v. Erlich, 278 App. Div. 244, 245; Richardson on Evidence [8th ed.], § 438).
The true test appears to be whether in the light of all the surrounding circumstances, and particularly the occasion for the presence of the third person, the communication was intended to be confidenital and complied with the other provisions of the statute. Applying this test, we hold that under section 352, and the cases construing it, the communication by defendant to Dr. Wechter was privileged, and admission of it by the trial court was error, as correctly stated by the Appellate Division.
Defendant raises the subsidiary question that the hospital record was improperly received in evidence before the Grand Jury, and the indictment should, therefore, be dismissed. A word may be said about that. He made no motion for inspection of the minutes of the Grand Jury. We do not know what evidence was adduced there, for the Grand Jury minutes are not a part of this record. Even if we assume that the hospital record was improperly before the Grand Jury, we have no way of knowing what other evidence may have been adduced and formed a sufficient basis for the indictment. There is a presumption that an indictment is based on legally sufficient evidence (see People v. Eckert, supra; People v. Sweeney, 213 N. Y. 37, 44; People v. Sexton, 187 N. Y. 495, 512; People v. Glen, 173 N. Y. 395, 403). We cannot here rule on the legal sufficiency of evidence before the Grand Jury without knowing what that evidence is. Defendant should have taken appropriate steps below and made a record so as to be in a position properly to raise the question on appeal.
Accordingly, the order of the Appellate Division should be affirmed.