STATE OF MAINE                                      SUPERIOR COURT
KENNEBEC, ss                                        CR-18-508


STATE OF MAINE

v.                                          **ORDER ON DEFENDANT'S MOTIONS**
                                                  **FOR NEW TRIAL and**
                                            **FOR JUDGMENT OF ACQUITTAL**

ANDREW BILODEAU


Before the Court is Andrew Bilodeau's Amended Motion for New Trial dated May 3, 2019. Defendant had previously timely filed another Motion for Acquittal and for New Trial on December 19, 2018 after a Kennebec County Jury found him guilty of Manslaughter on December 13, 2018. Both motions are opposed by the State. The State is represented by Deputy District Attorney (DDA) Frayla Tarpinian and the Defendant is represented by Attorney Kevin Sullivan. Oral argument on the motions was held May 15, 2019. The Court has reviewed the parties' filings, pertinent case law, as well as a transcript of the trial proceedings. For reasons stated, the motions are denied.

Defendant had moved for an acquittal at the close of the State's case. In the first motion, the Defendant argued that "the interests of justice" required a new trial due to an improper question of a law enforcement witness about the Defendant's statements regarding the victim's medical status. In the amended motion, the Defendant asserts that the trial evidence is insufficient to sustain a conviction for manslaughter because, in part, the Defendant had fully disclosed to the State Bureau of Motor Vehicles that his disability made it difficult for him to

1

stop his motor vehicle, and that he sometimes needed to maneuver around obstacles or motor vehicles because of his impaired ability to effectively apply his brakes, particularly when faced with an emergency. Because the Defendant was nevertheless legally permitted to drive by the State, he argues that under all the circumstances his conduct was not criminal in nature.

### *Defendant's statements regarding victim's medical status*

On the first day of trial, Sgt. Christopher Shaw from the Augusta Police Department testified. He was asked by the Deputy District Attorney (DDA) about his interview of the Defendant at the scene of the motor vehicle/pedestrian accident that resulted in the death of Emile Morin. The DDA asked Sgt. Shaw if the Defendant asked any question about Mr. Morin's condition at the scene and Sgt. Shaw responded as follows: "He – no, no, he was – it was kind of odd because there was no remorse, there was no – I told him...." Although Defense Counsel did not object, the Court initiated a sidebar where an extended colloquy took place. After a few exchanges between the Court and the DDA about the relevance of Sgt. Shaw's opinion about the Defendant's level of remorse, Defense Counsel stated that "this is a pretty major issue" for the defense. The Court indicated that it would tell the jury that Sgt. Shaw's statement would be stricken from the record, and the DDA indicated that Sgt. Shaw's statement in Court about "no remorse" was different than what was in his report. She clarified that the Defendant did in fact ask about the condition of Mr. Morin, contrary to what Sgt. Shaw said on direct examination. The DDA was then directed to "make it very clear what the truth of the events was" by impeaching Sgt. Shaw about the Defendant's inquiry about Mr. Morin's condition.

The Defendant now argues that the interests of justice requires a new trial because the curative instruction and impeachment by the DDA were insufficient to address the prejudice of Sgt. Shaw's opinion that the Defendant lacked remorse at the scene.

A review of the trial transcript supports the defense argument that while it was the Court that ordered the sidebar, an objection was in fact made by defense counsel after a few moments. However, the central issue for the Court is whether the prosecutor's question was intentionally designed to obtain a prejudicial response from Sgt. Shaw. The Court has concluded that it was not. As the State notes in its written argument, the jury had already heard the audio recording of the Defendant speaking with Sgt. Shaw in which he expressed his concern for the victim's condition. Sgt. Shaw gave an answer in Court which was unexpected, and which was at odds with the verbatim recording heard by the jury before Sgt. Shaw testified. The Court concludes that any prejudice to the Defendant was adequately addressed by the instruction by the Court to disregard Sgt. Shaw's opinion, and by the State's corrective impeachment of him, and that a new trial is therefore not justified for what occurred.

### State's arguments regarding the Defendant's disability

It is quite clear that Mr. Bilodeau suffers from a significant physical impairment of his ability to ambulate, and that he lacks strength and coordination in his extremities. The jury was able to see him walk to the witness stand, and he testified without rebuttal that he has suffered from cerebral palsy since birth. He uses either crutches or a wheelchair as he cannot walk without one or the other. He also testified that he has no depth perception in his right eye due to cataracts, and has trouble seeing how far away objects or obstacles are from his vehicle. He also testified without rebuttal that the Maine Bureau of Motor Vehicles (BMV) is aware of his

disability, and that he had asked the BMV that he be allowed to use "hand controls". No corroborating evidence about his disabilities or his communication with BMV was admitted at trial, but the State does not contest that he has significant physical limitations.

In the State's closing arguments, the DDA made the following statements about the Defendant's disabilities:

1) "Fact: Andrew Bilodeau has physical impairments that make it hard to see when he drives, that make it hard for him to operate his car, and make it hard for him to stop." [Tr. pg. 133]

2) "Let's look at the facts. Andrew Bilodeau – it is beyond a reasonable doubt that Andrew Bilodeau committed manslaughter. He told you when he spoke to you yesterday that he has a physical condition that makes it hard for him to drive and he went into detail about that. He is conscious of that, he is aware of the risk, and how do we know that? He limits his driving. He explained how he does that. He swerves to avoid hitting things, he does not apply his brakes. He told you that he needs hand brakes to drive that car safely, he told you that, and he told you about past times when he had collided with objects. Reasonable and prudent people do not drive cars they can't bring to a stop. Reasonable and prudent people use their brakes. This was a gross deviation of what a reasonable and prudent person would do, to get behind the wheel of a car that you cannot bring to a stop, to plan ahead to swerve if something comes in your way. To drive up a hill, a big hill, see a pedestrian ahead of you and make a decision to keep going. Andrew Bilodeau is conscious that he is a risk to others when he drives, he knows that. He chooses to drive anyway. That choice cost Emile Morin his life on that evening." *Id.* at 134-135.

4

3) "Andrew Bilodeau acted recklessly that night. Andrew Bilodeau acted recklessly when he did not stop his car. He acted recklessly when he hit and killed Emile Morin. He acted recklessly when he got behind the wheel of a vehicle and put everybody around him at risk that night. That is why Andrew Bilodeau is guilty." *Id.* at 137.

When Defense Counsel addressed the jury in closing, after reminded the jury that his client was operating at or below the speed limit, and that he had no alcohol or drugs in his system, and then he made the following statements about his client's disability and how it relates to his driving:

1) "The biggest issue here is did Andrew disregard any laws while driving his car on Northern Avenue last year? You heard Andrew had an active driver's license. You heard testimony that he has gone to the Bureau of Motor Vehicles, he has taken the test, he has explained to them his physical ability. We all have, if you have a driver's license, you have taken the test, but if you don't' have a driver's license know you have to take a driving test in order to get your driver's license, Andrew has done that. They have seen his condition, they have been in the car with him during a driving test. The issue of his physical abilities have been from birth. He testified that he has vision in one eye from birth, that does not prohibit him from getting a driver's license. He testified he has had some issues, he has dealt with the Bureau of Motor Vehicles on it, he has actually requested from them hand controls, which has been denied. The Bureau of Motor Vehicles is on top of this, they are on top of the issue, they know what is going on with Andrew, he had an active driver's license last November. When you look at the definitions of recklessly and criminal negligence, and I think I will put them back up there, you will see that they require a gross

deviation . . . . I think a reasonable person would expect that if they are licensed by the Bureau of Motor Vehicles, that it is safe for them to drive." *Id.* at 138-140.

2) "I think it makes sense, you have seen Andrew's condition, you have seen him walk up here and walk back, it seems to make sense his immediate reaction couldn't be his feet, that it would be his hands, and he testified that that's his immediate reaction is to swerve." *Id.* at 143-144.

3) So, is Andrew driving the car with a physical impairment, that he was licensed to do by the State of Maine, a gross deviation? I submit to you that it is not." *Id.* at 146.

On rebuttal, the DDA made the following statements:

1) "What was a gross deviation of the standard that a reasonable and prudent person would do is a man, Andrew Bilodeau, driving a vehicle, at or around the speed limit, up a steep hill and being unable to stop for a pedestrian that he saw in the crosswalk. It was a gross deviation for him to be in a vehicle that he can't stop and in that situation, that is not the fault of his vehicle, it is not the fault of the Bureau of Motor Vehicles, that is certainly not the fault of Emile Morin, and that is why you should find him guilty." *Id.* at 147-148.

The parties disagree on how directly or emphatically the State argued that it was reckless for Mr. Bilodeau to operate his motor vehicle on the night in question knowing that as a result of his disability he always had difficulty stopping the vehicle by applying his foot to the brake. The State clearly takes offense to the defense position that they were arguing that it was reckless for Mr. Bilodeau to drive on any occasion, but the Court has concluded that this is exactly the

State's argument in at least one instance. ("He acted recklessly when he got behind the wheel of a vehicle and put everyone else around him at risk that night . . . .") *Id.* at 137.

The Defendant now argues that the Court should either grant his renewed motion for acquittal based upon the State's arguments regarding his disability, and that because the State gave him a driver's license while knowing about his physical limitations, his conduct was not criminal.

The Court could find no reported Maine case with facts similar to this case. The Court did review Maine regulations regarding how driver's license restrictions are imposed by the Secretary of State. Contrary to Defendant's testimony, the regulatory scheme does not seem to require that the State authorize the installation of adaptive equipment for someone who, like Mr. Bilodeau, has delayed reaction times and difficulties applying his brakes as a result of his cerebral palsy. CMR 29-250-013 sets out rules the Secretary of State (SOS) must follow before imposing restrictions on driver's licenses. The Rule indicates that the SOS relies upon a variety of sources of information, including accident reports, permits, license and renewal applications, adverse reports of driving from citizens, family, physicians and other medical personnel, law enforcement and other government agencies, as well as a driver's motor vehicle history.

In addition, Maine statutory law does not provide a defense to a validly-licensed, disabled individual who injures or kills someone in a motor vehicle accident based on the person's disability. This indicates to the Court that a disabled individual such as Mr. Bilodeau is held to the same criminal liability standards as any other licensed Maine driver. The person cannot drive recklessly or with criminal negligence even if they have a license, and the question for the judge or jury is whether their conscious disregard of the risks or failure to be aware of the risks posed by their disability constitute a "gross deviation" from the standard of conduct that a reasonable

person would observe in the same situation, after consideration of the person's conduct and, importantly, "the circumstances known to the person."

In this case, Mr. Bilodeau testified without contradiction, as noted previously, that he had a valid license and that the BMV was well aware of the difficulties he had stopping and maneuvering his vehicle. He also testified that he was clearly aware of the risks his driving posed as he limited his driving as much as possible, rarely drove at night, and that he had been in previous motor vehicle accidents where he could not stop his vehicle and ran into objects or obstacles. He testified that after being "denied" hand controls by the BMV, he adapted his driving by swerving around objects as he knew his legs were too weak and slow to effectively stop his vehicle in an emergency. In this case the evidence suggests that he was in the process of unsuccessfully attempting to brake while at the same time trying to drive around the victim in the moment just before he struck and killed him.

In *Commonwealth v. Cheatham*, 615 A.2d 802 (1991) the Superior Court of Pennsylvania determined that a driver with a history of seizure disorders and whose license was restricted as a result, was criminally liable for homicide by vehicle when he struck and killed a child while having a seizure. The evidence indicated that the Defendant's license had been "recalled" after a physician had reported his seizure disorder to the Commonwealth, and that even while taking medication he had reported to his physician that he had seizures on a monthly basis. *Id.* at 803.

The Court found that the failure to have a valid license at the time "did not meet the level of causation required" for criminal liability. *Id.* at 805. However, the Court found that the Defendant "knew the frequency of his seizures even with medication, he knew that he had not had medical attention for three months, he knew that his seizures came on without warning, and he knew that the Commonwealth of Pennsylvania required that he be seizure-free for one year

8

before being licensed to drive." *Id*. at 807. The Court therefore held that, because the Defendant chose to drive despite having knowledge of these facts, that choice rose "to the level of a gross deviation from the standard of care that a reasonable person would observe."[1] *Id*.

In this case, the Court must determine whether, "viewing the evidence as a whole from the standpoint most favorable to the State, a jury acting rationally could not avoid having a reasonable doubt as to the defendant's guilt." *State v. Tait*, 483 A.2d 745, 746 (Me. 1984). In addition, "the weight to be given to the evidence and the determination of witness credibility are the exclusive province of the jury." *State v. Barnard*, 772 A.2d 852, 858 (Me. 2001). And "proof beyond a reasonable doubt may rest upon the testimony of a single witness," which would presumably include the testimony of a defendant. *State v. Bonney*, 351 A.2d 107, 110 (Me. 1976).

At trial, Mr. Bilodeau testified as follows about his difficulty stopping his vehicle, and the way he had adapted his driving to accommodate his disability:

> Yes, when I went to go and get my first driving test I told them that I was uncomfortable driving that way and they told me that all I need to do was practice, so I did practicing for a year, I got in three fender benders and I asked them again if I could have hand controls, and they said, well, we will give you the test again and we will see how you do. So I went and did the road test again and they said I increased seventy five percent, and they are not going to recommend me have hand controls, and I repeatedly asked them again the third time and they refused to give me any knowledge that I was going to have hand controls.

---

[1] In *People v. Decina*, 2 N.Y. 2d 133 (1956), the Court of Appeals of New York affirmed the conviction of a man who struck and killed a number of children while suffering from a seizure because he knew he was subject to epileptic seizures. The dissent pointed out that "the fatal assault by his car was after and because of defendant's failure of consciousness. To say that one drove a car in a reckless manner in that his unconscious condition caused the car to travel is to make two mutually contradictory assertions. One cannot be 'reckless" while unconscious. One cannot 'operate' a car in a culpably negligent manner or any other 'manner.' *Id*. at 146. After setting out a lengthy list of physical ailments that could result in a driver losing control of his vehicle, the dissent concluded that the Defendant's due process rights were violated. It held that under the majority theory, "No motorist suffering from any serious malady or infirmity can with impunity drive any automobile at any time or any place, since no one can know what physical conditions make it 'reckless' or 'culpably negligent' to drive an automobile. Such a construction of a statute offends against due process and against justice and fairness. The courts are bound to reject such conclusions when, as here, it is clearly possible to ascribe a different but reasonable meaning." *Id*. at 149. The Defendant in this matter has not raised any issue regarding due process.

9

(Trial Tr. pg. 103.)

Given these admissions that he was keenly aware of his difficulties stopping and maneuvering around obstacles, and that he had had three "fender benders", a rational jury could find beyond a reasonable doubt that he consciously disregarded the risk that he would injure someone. The Court does believe that a different jury, or a different factfinder, could have found reasonable doubt as to whether his disregard of the risk and the circumstances known to him— which in this case would importantly include the fact that he had been granted an unrestricted license—constituted a "gross deviation from the standard of care that a reasonable and prudent person would observe." That, however, is not the issue or the standard. *State v. Harding*, 408 A.2d 1003 (Me. 1979). The Court must determine that *no* rational jury could have concluded that the disregard of the risk was a gross deviation from what a reasonable and prudent person would observe in order to grant the Defendant's motion for acquittal. Given this trial record, the Court has concluded that a rational jury could find that the State has proved the "gross deviation" element in manslaughter, beyond a reasonable doubt.

The entry will be: Defendant's motion for a new trial and for entry of Judgment of Acquittal are denied.

_6/26/19_
**DATE**

_[signature]_
**SUPERIOR COURT JUSTICE**

Entered on the docket _6/27/19_

10